[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 7, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-12058

_____

D. C. Docket No. 93-00470-CR-WMH

UNITED STATES OF AMERICA,

                                   Plaintiff-Appellee-Cross-Appellant,

versus

MICHAEL ABBELL,
WILLIAM MORAN,

                                   Defendants-Appellants-Cross-Appellees.

-------------------------------------------------------------------
Appeals from the United States District Court
for the Southern District of Florida
-------------------------------------------------------------------

**(November 7, 2001)**

Before EDMONDSON, FAY and GARWOOD*, Circuit Judges.

_____

*     Honorable Will L. Garwood, U.S. Circuit Judge for the Fifth Circuit, sitting by
designation.

PER CURIAM:

Defendants, Michael Abbell ("Abbell") and William Moran ("Moran") (together "Defendants"), appeal their conviction for conspiracy to launder money and appeal the district court's denial of their motions for new trial. The government cross-appeals the district court's judgment of acquittal on the government's charges of RICO conspiracy and the sentencing court's application of the sentencing guidelines.

We affirm the district court's denial of judgment for both Defendants on the money laundering conspiracy, reverse the district court's judgment of acquittal for both Defendants on the RICO conspiracy charges, affirm the denial of Defendants' requests for a new trial, and remand the case to the district court for resentencing in the light of our opinion.[1]

## STATEMENT OF THE CASE

---

[1]Defendants' motion to dismiss the government's appeal for lack of jurisdiction is denied. The government's notice of appeal was timely. See 18 U.S.C. § 3731; Fed. R. App. P. 4(b)(1)(B)(i), (b)(2); United States v. Rothseiden, 680 F.2d 96, 97 (11th Cir. 1982); United States v. McInnis, 601 F.2d 1319, 1322-23 (5th Cir. 1979). Furthermore, the requirement that the government obtain approval under 18 U.S.C. § 3742(b) to prosecute this appeal is not jurisdictional. United States v. Hall, 943 F.2d 39, 41 (11th Cir. 1991). The government stated in its response to the motion to dismiss that approval was obtained. See id.

In 1996, the government filed a "Fourth Superseding Indictment" charging Defendants, and over 70 other codefendants, with these offenses: 1) participating in a RICO conspiracy (Count I); 2) engaging in substantive RICO violations (Count II); 3) participating in a conspiracy to import cocaine (Count III); 4) participating in a conspiracy to import and distribute cocaine (Count IV); and 5) participating in a conspiracy to launder money (Count IX). The government first prosecuted Defendants at trial beginning in 1997. Defendants were acquitted of the substantive RICO count (Count II) after a five-month trial, but the jury could not reach a verdict on the other counts. The district court declared a mistrial on those counts.

The government tried defendants a second time beginning in 1998. The district judge did not grant Defendants' motions for judgment of acquittal: motions made on all counts at the close of the government's case and after all of the evidence. During jury deliberations, the court received word that one of the jurors was behaving improperly and refusing to obey the law or to obey the court's jury instructions. The court then gave the jury instructions about the illegality of nullification and about the jury's duty to apply the law as instructed by the court. After receiving more complaints from jury members, the court conducted an inquiry into the conduct of one of the jurors. The court talked with the juror in

3

question and with each member of the jury in an attempt to ascertain whether the juror's conduct warranted her dismissal.

Over Defendants' objections, the district court dismissed the juror. The court had concluded that the juror was not applying the law to the case. Then, the jury found Defendants guilty of the RICO conspiracy (Count I) and money laundering conspiracy (Count IX) counts. The jury could not reach a verdict on the counts charging conspiracies to import and distribute cocaine (Counts III and IV).

Defendants filed motions for a new trial based on the juror's dismissal and on their discovery that another juror planned to write a book about the trial. The court denied the motions for a new trial. The court granted a post-trial judgment of acquittal on the RICO conspiracy charges (Count I) and on the conspiracy to import and distribute cocaine charges (Counts III and IV), but allowed the jury's guilty verdict on the money laundering conspiracy to stand.

Abbell and Moran were sentenced to 87 months and 60 months in prison, respectively. Abbell is free pending this appeal. Moran, who fled the jurisdiction before the verdict, was captured and is incarcerated.

Defendants appeal the district court's denial of judgment of acquittal on the money laundering conspiracy charge (Count IX) and the district court's denial of their motion for new trial based on the jury problems. The government cross-

4

appeals the district court's entry of judgment of acquittal on the RICO conspiracy charge (Count I) and the district court's calculation of Defendants' specific offense levels pursuant to the United States Sentencing Guidelines § 2S1.1.

## I. BACKGROUND[2]

In the 1980s and 1990s Miguel Rodriguez-Orejuela was one of the leaders of a widespread cocaine producing and smuggling empire that imported large quantities of cocaine into the United States. The organization widely know as the Cali Cartel (the "Cartel") smuggled cocaine into the United States by creatively concealing the cocaine and by using front businesses that were engaged in drug smuggling.

The Code of Silence and Efforts to Avoid Extradition

Rodriguez-Orejuela and other leaders of the Cartel maintained a strict code of silence among their employees. Employees were told not to cooperate with

---

[2]Because this appeal concerns charges where the jury found for the government, we take the facts in the light most favorable to the government's theory of the case. See United States v. Taylor, 972 F.2d 1247, 1250 (11th Cir. 1992).

authorities if employees were ever arrested. To maintain this code of silence the Cartel utilized a carrot-and-stick approach. On the one hand, the Cartel paid the attorney's fees of members and expenses for those members' families and, on the other hand, threatened those employees who were arrested and their families with injury or death if they cooperated with authorities.

Rodriguez-Orejuela also conducted an active campaign of collecting sworn statements from his employees to shield himself from prosecution or extradition to the United States. Members or employees of the Cartel apprehended by police would often soon thereafter sign affidavits disavowing knowledge of, or involvement with, Rodriguez-Orejuela, who was often named as a codefendant in prosecutions of persons apprehended by United States' authorities.

Later this program expanded to include taking deposition testimony from certain people who had been arrested in the United States. During deposition, they would give statements similar in nature to the statements in the affidavits. Persons were picked to give such deposition testimony based on the degree to which Rodriguez-Orejuela was implicated in their case by other evidence and by the degree to which he thought that the person would provide answers favorable to Rodriguez-Orejuela.

6

The Plan in Action

The evidence presented in this case centers around Defendants' acts relating to the arrest (due to four successful investigations by United States authorities) and trials of drug traffickers. In November 1991, a group of people led by Gustavo Naranjo ("Naranjo") was arrested after a shipment of cocaine was imported into Miami inside concrete pillars and then transported to Texas. In April 1992, a group of people led by Harold Ackerman ("Ackerman") was arrested in connection with cocaine disguised in frozen vegetables. In April 1993, a group of people led by Carlos Torres ("Torres") was arrested for conspiracy to import 500 kilograms of cocaine. In September 1993, a group of people led by Raul Marti ("Marti") was arrested in connection with a drug smuggling operation run out of a coffee-importing business.

The Naranjo Case

In August 1991, cocaine was discovered hidden inside concrete posts that were being delivered to the port of Miami. Customs agents set up surveillance of the shipment. In November 1991, a portion of the shipment was removed from a

7

warehouse and transported to Texas where the cocaine was removed from the concrete posts. In Texas, Naranjo, Tommy Johnson, William Brooks, Anibal Restrepo and J.C. Lanier were arrested.

Customs Agent Edward Kacerosky, who was deeply involved in the pertinent case, met with Naranjo shortly after his arrest. Naranjo began to cooperate with authorities and made some recorded phone calls to Rodriguez-Orejuela and another Cartel employee in Miami. The arrests in this case were made public on 25 November 1991. Searches were then conducted yielding a seizure of 12,250 kilograms of cocaine.

After the arrests were made public, Joel Rosenthal, a Miami lawyer, flew to Texas and met with Naranjo. Naranjo stopped cooperating after the visit from Rosenthal. Rosenthal arranged for Texas lawyer Frank Jackson to represent Naranjo. Rosenthal paid Jackson with money from Rodriguez-Orejuela. Naranjo was convicted in March 1992.

The Ackerman Case

Agent Kacerosky continued his investigations based on information he obtained from the Naranjo case. This activity led to the arrest of Harold

8

Ackerman, Carlos Giron, Pedro Pablo Gomes and Jacome Milanes for importing cocaine hidden in frozen vegetables. Searches resulted in a seizure of 6,650 kilograms of cocaine and of detailed ledgers showing millions of dollars in proceeds from cocaine sales and showing millions of dollars having been shipped back to Rodriguez-Orejuela in Columbia.

Rodriguez-Orejuela told Ackerman all about the code of silence back when Ackerman had been brought into the business. Rodriguez-Orejuela also had told Ackerman that, if Ackerman was ever arrested, his lawyer would be paid for and his family would be taken care of. Whenever Ackerman brought a new person into the smuggling activities, Rodriguez-Orejuela would tell them about the code of silence. Before Ackerman took over certain smuggling activities, he was introduced to Defendant Moran who was told that Ackerman would now be in charge.

Ackerman hired lawyer Robert Moore and instructed Moore to hire other lawyers for his codefendants. Francisco Laguna ("Laguna") (who worked for Defendant Abbell)[3] visited Ackerman in prison a few days after Ackerman's arrest, and Ackerman asked Laguna to relay a message to Rodriguez-Orejuela that

---

[3] Central to the government's case, Laguna's testimony throughout the trial was that Abbell and he were in constant communication about the work Laguna was doing for Rodriguez-Orejuela and that Laguna's activities were directed and approved by Abbell.

Ackerman wanted his attorney's fees paid. Ackerman was threatened by Gonzalo Paz, one of Rodriguez-Orejuela's Columbian attorneys, that he should not cooperate with police. After a trip to Columbia, Moore also relayed a message from Rodriguez-Orejuela to Ackerman that he should not cooperate with authorities or Ackerman's family would be killed.

Ackerman retained an independent lawyer, Ed Shohat, in October 1992. While representing Ackerman, Shohat received a call from Defendant Abbell. Abbell told Shohat that Rodriguez-Orejuela had agreed to pay his legal fees and wanted Ackerman to sign an affidavit that both Shohat and Abbell knew to be false. Shohat refused to have Ackerman sign the affidavit.

Defendant Moran represented Carlos Giron who was arrested and went to trial with Ackerman. When Shohat pursued a coercion defense for Ackerman, Moran asked if Shohat had received permission from Rodriguez-Orejuela to do so. All of the defendants in the Ackerman case were convicted.


The Torres Case

Working for Rodriguez, Carlos Torres was arrested in April 1993 for charges involving a 500-kilogram cocaine conspiracy. He pleaded guilty nine months later.

Torres hired Miami lawyer Stephen Golembe, who had earlier successfully represented Torres's wife. Torres's wife called Rodriguez-Orejuela to obtain money for her husband's legal fees. Rodriguez-Orejuela told her to talk to Moran, which she then did. Moran told Mrs. Torres that her husband had to pick Moran as his lawyer because Rodriguez-Orejuela had said so. Moran met with Torres after Torres's initial appearance before the district court. Moran told Torres that Moran was going to Columbia. Torres told Moran to tell Rodriguez-Orejuela and Jorge Lopez to change all the beeper numbers because the police had them. Moran wrote this information in his notes.

Moran requested and received money from Rodriguez-Orejuela for attorney's fees for Torres and his codefendants. Moran was able to obtain a $250,000 corporate surety bond for Torres and faxed a letter to Rodriguez-Orejuela requesting that property used to collateralize the bond come from "clean money." It was never necessary to put up the money for the bond: the government successfully appealed the bond ruling and kept Torres in jail.

Torres fired Moran after hearing that Moran had written the prosecutor to inquire about a plea bargain. Torres went back to Golembe, but he fired Golembe when Golembe filed a statement with a probation officer that implicated Rodriguez-Orejuela. Torres then hired Laguna and Ferguson. Laguna submitted a new statement on behalf of Torres that did not implicate Rodriguez-Orejuela.

### The Marti Case

Agent Kacerosky was able to identify another smuggling operation from the records obtained in the Ackerman case. In September 1993, authorities searched coffee containers that had arrived in Miami in August and had been under surveillance since their arrival. Authorities seized over 5,600 kilograms of cocaine. Raul Marti, Oscar Rabasa, Rodney Paterson and Richard Carlyle were arrested for involvement with the importation of the cocaine.

Marti hired Miami lawyer Dan Forman to represent him. Laguna informed Forman that Laguna represented Rodriguez-Orejuela and wanted Marti to sign one of the exculpatory affidavits. When Forman informed Laguna that he would not tell his client to sign a false affidavit, Laguna told Forman that Rodriguez-Orejuela would not pay Marti's legal fees unless Marti signed the affidavit.

12

Later, Laguna visited Marti in jail without Forman's permission. Laguna then called Forman to inform him that funds were being transferred to him. Forman notified the government of the $100,000 he received and turned it over to the government.

### Cash Payments to Prisoners and Family Members

During his representation of Giron, Moran's secretary gave Giron's wife $5,000 in cash that Giron's wife believed to have come from Rodriguez-Orejuela. In May 1993, Moran had a courier deliver $10,000 to Torres's wife. After receiving the money, Mrs. Torres was arrested and deported to Columbia. After Giron was convicted and he retained Ristau & Abbell, the firm began paying about $100 a month into his prison commissary account. Ristau & Abbell also made payments into Torres's commissary account. The advances to Giron and Torres were made for about a year. Ristau & Abbell also made payments into the commissary accounts of people who were not clients of the firm. All of the payments were made using money orders as required by the Bureau of Prisons' regulations.

Laguna delivered cash payments to Giron's wife, to Torres's wife and to Torres's son. Laguna also arranged for a corporate surety bond in the amount of $500,000 for Raul Marti, which required a $75,000 payment to a bail bondsman. Laguna and Abbell asked Ferguson to receive the cash payment and to forward the money to Marti's wife. Ferguson received the money and forwarded it to Marti's wife.

## II.

The Money Laundering Conviction

The structure of the money laundering statute, 18 U.S.C. § 1956, makes it illegal to engage knowingly in acts involving illegally obtained money either to promote a criminal activity or to conceal the source of the funds. The jury, by special verdict in this case, found that Defendants had engaged in acts to conceal the source of the funds, not to promote illegal activity.[4]

---

[4]The jury therefore convicted Defendants under the concealment part of the money laundering statute, 18 U.S.C. § 1956 (a)(1)(B)(i), which says:

"Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – knowing that the

14

Defendants argue on appeal that the government failed to prove that Defendants ever joined or intended to join an illegal agreement to violate the money-laundering concealment statute. Also Defendants argue – more specifically – that the government could not show that they agreed to enter such an agreement because the government never showed that the transactions that actually took place were illegal. Defendants say the government failed to produce sufficient evidence that 1) the funds involved in the transactions were from narcotics proceeds; 2) that Defendants knew the funds were from narcotics proceeds; and 3) that the purpose of the transactions was to disguise the source or ownership of the funds involved or to create the appearance of legitimate wealth for Rodriguez-Orejuela.

Defendants first argue that the government failed to present evidence that the actual funds used in the pertinent transactions came from illegal activity. Pointing to precedents, they say that, when the government fails to trace directly the funds used in the transactions, it must at least show that no source of legitimate income could have generated the funds used or that the funds used come from a source of funds that are commingled with illegally obtained funds. But, Defendants overstate the holdings in the cases upon which they rely.

---

transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" violates the statute.

In United States v. Eastman, 149 F.3d 802, 804 (8th Cir. 1998), the Eighth Circuit said that it was sufficient evidence to support a jury verdict for the funds to come from illegal sources if the government showed defendant had no legitimate source of income to create these funds. In United States v. Westbrook, 119 F.3d 1176, 1191 (5th Cir. 1997), the Fifth Circuit said it was sufficient evidence to support a jury determination if the government showed that "defendant's cash outflow in a financial transaction exceed[ed] his legitimate income." These cases decided issues about whether the proof in those cases was sufficient to support a jury verdict, not about the degree of proof that is required as a minimum.

In this case, the government presented evidence that the Cartel received proceeds from drug sales in the hundreds of millions of dollars. Evidence was presented that much of this money was kept in Miami and used to finance Cartel operations and that large sums of it were transported to Columbia for Rodriguez-Orejuela's use. When a jury hears evidence that a drug operation is bringing in hundreds of millions of dollars, keeping large sums in Miami, and sending large sums to Rodriguez-Orejuela in Columbia, the jury can reasonably infer that the money Rodriguez-Orejuela used to pay lawyers defending himself and his employees from prosecution for drug trafficking is coming from specified illegal activity.

Defendants argue that evidence showed that Rodriguez-Orejuela, in Columbia, owned a wide variety of "legitimate" businesses, including a chain of pharmacies, grocery stores, construction companies, and a soccer team from which Rodriguez-Orejuela could have paid Defendants. We will accept that Rodriguez-Orejuela's businesses produced some amount of cash flow from which the funds used in transactions underlying this case might have been derived. We, however, will not accept that the evidence demanded a finding that Rodriguez-Orejuela's businesses were "legitimate."

Defendants forget that our job is to review the sufficiency of the evidence: not to choose between competing interpretations. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the evidence." United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001) (quoting United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997).

Defendants point us to no evidence on the amount of money that these companies made, and they offered no formal documents proving the existence of these companies or the amount of income Rodriguez-Orejuela himself derived

17

from these companies.  But, more important, the government presented evidence that all of Rodriguez-Orejuela's "legitimate" businesses were funded with narco-profits.  In addition to supporting a finding that the ultimate source of the money received by Defendants was illegal activity, we think the government's evidence on this point supports a finding that Rodriguez-Orejuela's illegal and legal moneys -- to the extent legal moneys existed -- were commingled, thus tainting all funds originating from Rodriguez-Orejuela.[5]  See United States v. Cancelliere, 69 F.3d 1116, 1120 (11th Cir. 1995) (money laundering statute allows for conviction "where the funds involved in the transaction are derived from commingled account of which only part comes from 'specified unlawful activities'").

The government must prove the funds came from illegal activity.  We conclude that, when the government presents the kind of evidence it presented in this case, the evidence is sufficient to support a beyond-reasonable-doubt jury finding that the pertinent funds came from an unlawful source.  We acknowledge that Defendants' evidence about "legitimate" businesses might be able to rebut the

---

[5]The amount of illegal money that needs to be combined with another, larger amount of legal money need only be slight to render all the money commingled and, therefore, illegal.  And, once the illegal and legal moneys are commingled, no passage of time will remove the taint. United States v. Ward, 197 F.3d 1076, 1083 (11th Cir. 1999) ("The district court's theory that the passage of time and the large infusion of legal proceeds remove the taint from the illegal proceeds defeats the purpose of the money laundering statute and promotes money laundering schemes. Because money is fungible, the government must prove only that the tainted proceeds were commingled with other funds.").

18

government's evidence in the eyes of some jury. But Defendants' evidence does not nullify the government's evidence to demand that we overturn a factual finding by the jury that the funds came from illegal activity.

Defendants next contend that no evidence was presented from which a reasonable jury could determine that Defendants actually knew the funds provided in the pertinent transactions were proceeds from narcotics dealing. Evidence presented by the government supported finding that both Defendants 1) knew that their long-time clients were high level drug traffickers; and, 2) were close to and knew Rodriguez-Orejuela and his associates well.

Evidence presented by the government against Abbell further supported findings that 1) Abbell altered, deleted, or destroyed his financial records involving Rodriguez-Orejuela; 2) Abbell worked closely with his long-time associate, Laguna, who testified that he (Laguna) was in "constant contact" with Abbell about their representation of Rodriguez-Orejuela and other Cartel clients; and 3) Laguna knew that all Rodriguez-Orejuela's businesses were funded with narco-profits.

Abbell contends that the government essentially argues that Abbell knew that the funds he received were derived from narcotics trafficking because Abbell knew his client was involved in narcotics trafficking. Abbell argues that evidence

19

that he knew of Rodriguez-Orejuela's extensive narcotics trafficking is not sufficient to prove that Abbell had knowledge of the illegality of the funds he received, considering that the evidence of Rodriguez-Orejuela's "legitimate" business interests establishes a legitimate source of funds from which Abbell reasonably believed he was being paid.

As discussed above, the evidence of Rodriguez-Orejuela's allegedly legitimate business interests in Columbia is slight: no formal documents evidencing their existence and no evidence of the amount of money they allegedly produced. The government's evidence, in contrast, tends to show that all of the businesses were established with narcotics proceeds and allows -- when combined with other evidence -- a reasonable jury to infer that Abbell knew (based on the reasonable inference of what Laguna told Abbell)[6] that all Rodriguez-Orejuela's businesses were established with narcotics proceeds. Thus, if the evidence shows that Rodriguez-Orejuela had other business interests, the evidence also shows that Abbell knew those interests were not legitimate. In other words, the evidence supported a jury finding beyond a reasonable doubt that, to the extent Rodriguez-

---

[6] Laguna testified that he was in "constant contact" with Abbell about their representation of Rodriguez-Orejuela and other members of the Cartel for drug trafficking – including forfeiture proceedings that required investigation into the finances of Cartel businesses in Columbia. Abbell's office manager also testified that Laguna and Abbell talked two or three times a day. The jury could reasonably infer that Laguna told Abbell about the state of Rodriguez-Orejuela's businesses in Columbia: that they were all financed with narco-profits.

20

Orejuela had other business interests, Abbell knew that those business interests were so intertwined with Rodriguez-Orejuela's narcotics trafficking that money paid by Rodriguez-Orejuela came, at a minimum, from commingled funds.

The government's evidence that, in the days and weeks before a search warrant was executed against Abbell's office, Abbell destroyed or altered his records of his bills to Rodriguez-Orejuela – including his bills for reimbursements for payments to third-parties on Rodriguez-Orejuela's behalf – further supports a reasonable jury's finding that Abbell knew the money he was paid involved the drug trade. See United States v. Mastropieri, 685 F.2d 776, 790-91 (2d Cir. 1982) ("There can be no doubt that an attempt to suppress material records permits an inference of consciousness of guilt and therefore of guilt itself."); c.f. United States v. Hughes, 716 F.2d 234, 240-41 (4th Cir. 1983) ("Fabrication of evidence by a defendant ... [is] clearly admissible to prove his guilty state of mind.").

The government also presented sufficient evidence upon which a jury could reasonably find that Moran knew that the money he received was derived from narcotics trafficking. The government presented evidence that Moran often solicited money from Rodriguez-Orejuela. When he made these solicitations, he normally did not indicate that he needed "clean money," or that he desired unclean money. For instance, in Moran's notes that he made after a meeting with Torres in

21

jail, Moran recorded that he needed to request money from Rodriguez-Orejuela to pay to Torres for support of his family.[7] Those notes do not mention any requirement that the money be "clean." A fax from Moran to Rodriguez-Orejuela's men in Columbia during the same period also requests money for Torres without specifying that it be "clean money." In contrast, another fax from Moran to Rodriguez-Orejuela's men in Columbia, also sent around the same time, specifically requested "CLEAN MONEY" (all caps in original) for use in obtaining Torres' bond. Such a request could either imply that Moran only dealt in clean money or, especially in the light of his failure to request "clean money" in other situations, that he felt he needed clean money only for this specific transaction.[8] Such a determination is for the jury. We think that this "CLEAN MONEY" evidence supports a beyond-reasonable-doubt jury finding that Moran was aware that some money he was receiving was from narcotics trafficking. Put differently, we accept that a jury could treat the emphatic and isolated request for "clean money" as evidence that "clean money" was the exception to the usual rule

---

[7] Immediately after this meeting with Torres, Moran flew to Columbia and met with Rodriguez-Orejuela. Moran then flew back with money for Torres and couriered $10,000 to Torres' wife.

[8] In fact, evidence was presented to the jury that Moran did need clean money for this specific transaction. Torres' bond included an explicit requirement that the money not be proceeds of illegal activity. Thus, a jury could reasonably conclude that, when outside influences demanded the use of clean money, Moran requested clean money because he knew that if he did not request clean money, the money he received would be from narcotics trafficking.

22

of dirty money. We recall the ancient legal maxim: the exception also declares the rule.[9]

We now address whether the evidence supports a finding that the transactions in which Defendants were involved were designed to conceal the source of the funds. Abbell concedes that he engaged in the following transactions. He, on multiple occasions, paid money into the commissary accounts of inmates: both those inmates he represented and those he did not. He deposited this money in their accounts using money orders paid for by Ristau & Abbell and signed by Abbell or Ristau. Abbell then billed Rodriguez-Orejuela for these sums. Abbell also paid Mrs. Giron (wife of one of the defendants) $3,000. He then billed Rodriguez-Orejuela for the $3,000. Abbell's office manager testified that Rodriguez-Orejuela thereafter reimbursed Abbell for the deposits and the $3,000.

Moran concedes that he engaged in the following transactions. He paid Mrs. Giron $5,000 in cash. He paid her this money in his office. He sent Mrs. Torres (wife of another defendant) $10,000 in cash. This money was sent via commercial courier, identifying his law firm as the sender. Evidence was presented that the

---

[9]Exceptio quoque regulam declarat: "[t]he exception also declares the rule." S.S. Peloubet, A Collection of Legal Maxims in Law and Equity 74 (Fred B. Rothman & Co. 1985) (1884) (collecting legal maxims, citing to their origin, and providing English translations). A related maxim states: Exceptio probat regulam de rebus exceptio, "[a]n exception proves the rule concerning things not excepted." Id.

23

cash for both of these payments was given to Moran by Rodriguez-Orejuela in Cali.

Defendants argue that no evidence shows that these payments were designed to conceal the source of the funds; they say they were paid to help people in need of financial assistance. Defendants argue that evidence did not demonstrate the "legitimization" step required for money laundering. We disagree.

Defendants correctly point out that we have said section 1956(a)(1)(B)(i) is "designed to punish defendants who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises." United States v. Majors, 196 F.3d 1206, 1212 (11th Cir. 1999). The facts here do not appear to be that kind of case. No evidence shows that the pertinent transactions ended up creating the appearance of legitimate wealth for Rodriguez-Orejuela.

But, the text of the statute is not that restrictive. It applies to transactions involving illegal proceeds when the transaction is designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956 (a)(1)(B)(i). The statute does not always require that the appearance of legitimate wealth be generated for Rodriguez-Orejuela. We believe it is enough for the statute that Defendants

24

engaged in transactions from which Rodriguez-Orejuela received a benefit (and moneys were paid on behalf of Rodriguez-Orejuela) while concealing that Rodriguez-Orejuela was the source of the funds.[10]

In this case, the evidence showed 1) Rodriguez-Orejuela was obligated to take care of people to maintain the code of silence; 2) Rodriguez-Orejuela was seeking to avoid extradition to, and prosecution in, the United States by obtaining from employees affidavits stating that they did not even know who he was; 3) Defendants were involved in obtaining the affidavits while they were involved at the same time in dispersing funds from Rodriguez-Orejuela to employees, and their wives, who were claiming not to know Rodriguez-Orejuela; 4) Rodriguez-Orejuela gave Defendants large sums of money; and 5) Defendants then paid large amounts of this money to others, including employees from whom affidavits were sought and their wives.[11]  This evidence supports a jury finding that these transactions

---

[10] Concealing the source of funds does not need to be the only goal of the pertinent transaction.  See United States v. Wynn, 61 F.3d 921, 924 (D.C. Cir. 1995).  Also, that Defendants openly made payments to the Bureau of Prisons, Mrs. Torres, and Mrs. Giron fails to demonstrate that they were not attempting to disguise the source of the funds. See United States v. Starke, 62 F.3d 1374, 1384 (11th Cir. 1995).

[11] In Abbell's case, points four and five are reversed for the transactions discussed.  In the context of this case, the fact that Abbell first advanced his own money in the transactions at issue and then sought reimbursement from Rodriguez-Orejuela is of no legal consequence.  Abbell, however, argues that "before the primary offense of money laundering can occur, the underlying criminal activity must be complete."  Majors, 196 F.3d at 1212 n.13.  The flaw in Abbell's reliance on quotes like the one above is that evidence showed that Rodriguez-Orejuela had, before Abbell made the payments at issue, already engaged in massive illegal narcotics

were designed to conceal that Rodriguez-Orejuela was paying money to persons, and their families, who were claiming that they did not know who he was.

The evidence thus adequately supports the finding that Defendants willfully participated in a conspiracy to conceal the source of funds that were the proceeds of unlawful conduct and were paid to cartel employees and their families by Rodriguez-Orejuela.

RICO Conspiracy

We review the district court's entry of judgment of acquittal for insufficient evidence on the RICO conspiracy charge de novo. United States v. Toler, 144 F.3d 1423, 1428 (11th Cir. 1998). We must take the evidence in the light most favorable to the government and determine whether a reasonable jury could have concluded beyond a reasonable doubt that Defendants were guilty of the offense charged. Id.

The indictment charged Defendants with participating in a RICO conspiracy and listed various forms of obstruction of justice and money laundering as

trafficking. We discern no other relevant difference between the order in which Abbell and Moran completed points four and five.

26

predicate acts agreed to by Defendants.  Agreement to participate in a RICO conspiracy can be proved in one of two ways: 1) by showing an agreement on an overall objective; or, 2) by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a single objective conspiracy. United States v. Church, 955 F.2d 688, 694 (11th Cir. 1992).  If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts.  United States v. To, 144 F.3d 737, 744 (11th Cir. 1998).[12]

For Defendant Moran, we have little trouble determining that a reasonable jury could have concluded beyond a reasonable doubt that he agreed to commit two predicate acts showing an agreement to participate in the RICO conspiracy.

We have already addressed Moran's activities in the money laundering conspiracy which supports a finding that he was engaged in those predicate acts.

---

[12]Paragraph 2 of the indictment lists over 70 people as well as "others known and unknown to the grand jury."  It then says that they "managed, operated, were employed by and associated with the Enterprise."Defendants argue that this language requires the government  prove Defendants operated or managed the conspiracy, even though the law of this circuit does not require such proof for a RICO conspiracy.  We disagree.

In the light of the whole indictment, it is clear to us that paragraph 2 is a general statement that this group of over 70 people, as a group, managed, operated, was employed by and associated with the Enterprise – not that each person individually did all of these things. The indictment goes on to charge specific acts within the conspiracy to the many individuals allegedly involved.  Because neither the indictment nor the law of the circuit require proof that Defendants operated or managed the enterprise, Defendants' collateral estoppel argument also fails.

Moreover, evidence supports the conclusion that Moran was very much involved in obtaining multiple false affidavits from members of the Cartel who were arrested importing drugs – each false affidavit constituting a separate predicate act.

Copies of affidavits were found on Moran's computers in his office. Also, letters to other attorneys were presented into evidence where Moran outlined the procedure for procuring affidavits from their clients that would exculpate Rodriguez-Orejuela. In one letter Moran wrote to Rodriguez Orejuela; "Setting aside our most recent disagreements as to the best way of acquiring certain affidavits, my observations is that what was most important to accomplish has been attained, and at the same time I think that some of my suggestions, at least in part, that of using an independent attorney (Laguna), has been suitable to this matter, and everyone came out clean." This letter is at least evidence of Moran's organizational capacity in the false affidavit scheme and his awareness that special procedures needed to be used for everyone to come out "clean." A jury could infer from this letter both an organizational role by Moran and guilty knowledge on his part.

About Defendant Abbell, in addition to his acts in the money laundering conspiracy, we conclude the government offered sufficient evidence of two predicate acts of obstruction of justice, supporting the jury's verdict for RICO

28

conspiracy. We focus specifically on two predicate acts. First, Abbell's involvement in trying to obtain a false exculpatory affidavit from Ackerman; and, second, his involvement in the section 1782 deposition process.

Evidence was presented that Abbell was deeply involved in obtaining a false affidavit from Ackerman. While attempting to get the affidavit from Ackerman, Abbell spoke with Ackerman's lawyer Ed Shohat. Shohat recognized the affidavit as false and that Abbell knew the affidavit was false. Shohat also testified that Abbell had told Rodriguez-Orejuela that Shohat would make sure Ackerman signed the affidavit, thus putting Shohat in danger if Ackerman did not sign. Abbell also visited Ackerman in prison, where Ackerman indicated he intended to sign the affidavit and asked Abbell to ask Rodriguez-Orejuela to pay his attorney's fees.

Evidence was also presented that Abbell directed the 1782 deposition scheme. Abbell targeted employees of the Cartel likely to give false exculpatory statements benefitting Rodriguez-Orejuela, but warned against deposing employees of the Cartel who might give damaging statements. Abbell knew that the employees he targeted, such as Giron whom he represented, would have to lie to answer the questions in a manner that benefitted Rodriguez-Orejuela.

29

Abbell argues that his activities in obtaining false affidavits and directing efforts to obtain section 1782 depositions could not, as a matter of law, possibly constitute predicate acts of obstruction of justice. Relying on United States v. Aguilar, 115 S. Ct. 2357 (1995), and United States v. Vaghela, 169 F.3d 729 (11th Cir. 1999), Abbell -- correctly, we think -- contends that a person does not engage in obstruction of justice unless his acts will have the natural and probable effect of interfering with a judicial proceeding. He then says that, because the affidavits and the section 1782 depositions were meant only to be used in extradition proceedings in Columbia, and that the possibility of such extradition proceedings ever occurring were extremely low, the possibility of use in a judicial proceeding was, at best, speculative.

After reviewing the statute and the precedents upon which Abbell relies, we conclude that his arguments are without merit. In Aguilar, the essential question was the intent of the defendant. Aguilar 115 S. Ct. at 2362. The Court wrote that, when a person makes a statement to an investigating official (and the speaker is not aware that it is likely that the official will testify in a judicial proceeding) not enough evidence is presented of that lying person's intent to interfere with a judicial proceeding. Id. at 599. But in Vaghela, we said the requirement that defendants' acts have the natural and probable effect of interfering with the due

30

administration of justice is not so narrow as to exclude efforts "to obstruct specific future judicial proceedings." Vaghela, 169 F.3d at 734.

In this case, Rodriguez-Orejuela had already been named in several cases as a codefendant. Therefore, judicial proceedings in the United States were in progress to which the false affidavits and depositions could be linked. Defendants' claim that the affidavits or depositions were to be used in extradition proceedings in Columbia is not determinative. It is clear that these affidavits (which were in English) could also be used as a defense if Rodriguez-Orejuela was ever forced to stand trial in one of the cases in which he was a named defendant.[13] Moreover, a lawyer working the affidavit scheme would know that these affidavits and depositions could be so used.

Because we conclude that sufficient evidence was produced by which a jury could find beyond a reasonable doubt that Defendants agreed to overall goals of the RICO conspiracy or engaged in two predicate acts manifesting their agreement, or both, the district court's order granting Defendants judgment of acquittal on Count I must be vacated.

---

[13]Defendants come close to admitting as much when they say that the affidavits would not have been very helpful to an extradition proceeding in Columbia, because they say factual innocence is no defense to extradition in Columbia.

Defendants' Motion for New Trial

Defendants argue that they are entitled to a new trial for two reasons. First, they say that new evidence on Juror Blanton's plans to write a book about the case demanded more inquiry by the district court into what influence this plan had on jury deliberations. Second, they say they were denied their right to a unanimous jury verdict when the court improperly excused Juror Alfonso for cause under Fed. R. Crim. P. 23(b). We conclude Defendants are not entitled to a new trial: the district court did not abuse its discretion.

Juror Blanton

We first briefly address, and determine that there is no merit in, Defendants' arguments regarding Juror Blanton. The district court correctly noted that no factual basis exists for the assertion that Blanton shared outside information with the jury during trial. And Blanton's plan to write a book about his experiences on the jury does not constitute the kind of allegation about outside influence that we have said requires an investigation by a district court. See United States v.

32

Caldwell, 776 F.2d 989, 996 (11th Cir. 1985) ("The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate.").

Dismissal of Juror Alfonso

We review a district court's ultimate decision to excuse a juror after the start of deliberations for abuse of discretion. United States v. Register, 182 F.3d 820, 839 (11th Cir. 1999). And, in the context of other juror removal cases, we have written that "[w]e will reverse the district court only if we find that it discharged the juror 'without factual support, or for a legally irrelevant reason.' " Id. at 839 (quoting United States v. Smith, 918 F.2d 1501, 1512 (11th Cir. 1990)).

Federal Rule of Criminal Procedure 23(b) permits a district court "to excuse a juror for just cause after the jury has retired to consider its verdict." "Just cause" exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions. United States v. Geffrard, 87 F.3d 448, 451-52 (11th Cir. 1996) (excusing juror who expressed inability to follow judge's instructions on the law due to religious beliefs).

Juror Alfonso was dismissed after other members of the jury alleged, in a note to the district court judge, that Juror Alfonso was not applying the law as

33

directed. A risk exists, however, that ten or eleven members of a jury that have collectively reached agreement on a case's outcome may thereafter collectively agree that the one or two hold-outs – instead of honestly disagreeing about the merits – are actually refusing to apply the law as instructed by the court in an impermissible attempt to nullify the verdict. The jury's majority may very well further agree to request the court's intervention with regard to those one or two dissenting jurors who are, according to the majority, refusing to apply the law. Thus, judges must be careful not to dismiss jurors too lightly, even in the face of complaints from a majority of the jury. Federal defendants have some right (be it statutory or perhaps constitutional) to a unanimous verdict by, normally, twelve jurors.

Because of the danger that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification, we must apply a tough legal standard. In these kind of circumstances, a juror should be excused only when no "substantial possibility" exists that she is basing her decision on the sufficiency of the evidence. See United States v. Thomas, 116 F.3d 606, 621-22 (2d Cir. 1997); United States v. Brown, 823 F.2d 591, 596 (D.C. Cir.

1987).[14]  We mean for this standard to be basically a "beyond reasonable doubt" standard.

We also conclude that, for example, whether a juror is purposely not following the law is a finding of fact that we will review for clear error.[15]  De novo review would undermine the well-established rule that the abuse of discretion standard applies to a district court's decisions involving juror misconduct.  See, e.g., United States v. Yonn, 702 F.2d 1341, 1344-45 (11th Cir. 1983).  Furthermore, because the demeanor of the pertinent juror is important to juror misconduct determinations, the district court is uniquely situated to make the credibility determinations that must be made in cases like this one: where a juror's motivations and intentions are at issue.  See United States v. Gabay, 923 F.2d 1536, 1543 (11th Cir. 1991) (district judge is in a position to observe jurors on a daily basis and listen to their pledges to deliberate fairly and is therefore in the best position to judge

---

[14] In United States v. Brown, the D.C. Circuit used both the term "any possibility" and the term "substantial possibility."  We believe the terms are interchangeable, both meaning a tangible possibility, not just a speculative hope. Cf. Pierce v. Underwood, 108 S. Ct. 2541, 2549-50 (1988) (noting two different meanings of "substantial;" one meaning a high degree or great deal of something, the other meaning in substance or in the main).

[15] The Ninth Circuit explicitly applied a clearly erroneous standard of review to a district court's findings of fact and credibility determinations on jury misconduct, United States v. Matta-Ballesteros, 71 F.3d 754, 765-66 (9th Cir. 1995), and the Second Circuit, in a case after Thomas, wrote that a district court's finding regarding a juror's misconduct "is a finding of fact to which appropriate deference is due."  See United States v. Baker, ___ F.3d ____ (2d Cir. August 15, 2001).

35

demeanor of jurors). Cf. Owens v. Wainright, 698 F.2d 1111, 1113 (11th Cir. 1983)

("Appellate courts reviewing a cold record give particular deference to credibility

determinations of a fact finder who had the opportunity to see live testimony").[16]

Thus, a district judge is required to apply the "substantial possibility" standard to

his own investigation and in coming to his determination that the juror is or is not

basing her decision on the sufficiency of the evidence. But, if the trial court applies

this standard and determines as a matter of fact that no substantial possibility exists

that the pertinent juror is basing her decision on the sufficiency of the evidence, we

will review that finding only for clear error.

In this case, the district court, after an evidentiary hearing, found these facts:

1) Alfonso "was unwilling to follow the law, and [ ] was engaged in an attempt to

willfully disregard the Court's instructions;" 2) "the record does not reveal a

'substantial possibility'[17] that Juror Alfonso's position was due to her belief that the

evidence was insufficient to support a conviction as to the RICO conspiracy;" and

3) "she did not intend to follow the Court's instructions – that Juror Alfonso did not

---

[16]After reading the record of the district court's inquiry in this case, we are strengthened in our view of the need to provide deference to the district court's determination of facts in situations like these.

[17] The district court relied on Brown and other cases which we use here today and put the term "substantial possibility" in quotation marks in his order. We accept that the district court applied the same "substantial possibility" standard that we apply today.

intend to apply the law as set forth in those instructions and had not changed her mind following the Court's instructions."

Briefly stated, our review of the record shows the following. All jurors agreed that early in the process Juror Alfonso, in some way, made comments that she did not have to follow the law and that the court's instructions were only advisory and not binding on the jury.[18] After this information came to light, the trial court gave more instructions about the jury's duty to apply the law and to obey the court's instructions. After this additional instruction, Alfonso made no more direct statements about her intention not to follow the law. The majority of the jurors, however, said that she still was not engaged in deliberations, would not consider evidence nor discuss the applicable law. Some jurors indicated that they were outraged by Alfonso's decision to do her nails during deliberations.[19] The trial court -- sometime after having given its additional charge on the duty to follow the

---

[18] We stress that the other jurors testified that Juror Alfonso actually <u>said</u> she was not going to follow the law, not simply that they <u>believed</u> Juror Alfonso was not following the law.

[19]Although we are not deciding today to what degree a juror's duty to deliberate requires her to be actively engaged in debate, we do believe that, when a district court is investigating the possibility of impermissible nullification by a juror and when that juror has said at an earlier time in deliberations that she need not follow the law or the judge's instructions, a later display of unwillingness to deliberate or to engage in discussion is something the court can take into consideration in determining the credibility of the pertinent juror's claims that she is now applying the law and obeying the instructions of the court.

law -- talked to each of the jurors, including Alfonso herself.[20]  Juror Alfonso's own testimony on her commitment to following the law was not certain.  We accept that the record supports the district court's skeptical view of Juror Alfonso's answers to its questions and that the district court's findings about Alfonso's intentions are supported by the record.

This record shows that the district court's determination that Juror Alfonso was not basing her decision on the sufficiency of the evidence was not clearly erroneous, even in the light of a beyond a reasonable doubt standard.  Because the district court applied the correct standard – no substantial possibility that the juror was basing her decision on the sufficiency of the evidence – we conclude that it was no abuse of discretion for the trial court to dismiss Juror Alfonso.

CONCLUSION

---

[20]We conclude that Defendants' argument that the district court's inquiry so tainted the jury pool as to make a fair trial impossible is without merit.  The record shows the court proceeded with extreme caution to protect the integrity of the jury process.  Moreover, the court instructed the jury after Alfonso's dismissal that his dismissal should not affect their deliberations.  To find much fault with the inquiry in this case would unduly hinder a district court's ability to detect and rectify a juror's refusal to obey her duty in applying the law to the case and obeying the court's instructions.  See United States v. Harris, 908 F.2d 728, 733 (11th Cir. 1990) (district courts have broad discretion in determining the proper investigative procedure for looking into alleged juror misconduct).  We do, however, caution district courts to be careful about invading the secrecy of the jury's deliberations and to err on the side of too little inquiry as opposed to too much.

In regard to Abbell and Moran, we have concluded that the government presented sufficient evidence to sustain their convictions on both money laundering conspiracy (Count IX) and RICO conspiracy (Count I).  The district court's judgment of acquittal for Defendants on the RICO conspiracy charge must be vacated and Defendants' convictions for RICO conspiracy must be reinstated. Defendants' sentences are vacated in their entirety and remanded to the district court for resentencing.[21]

AFFIRMED in PART and REVERSED in PART and REMANDED.

---

[21]Because Defendants' sentences have been vacated in their entirety and remanded to the district court for resentencing consistent with this opinion, we need not address the government's sentencing arguments.