[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11636
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cv-01400-VMC-AAS

LISA N. BOSTICK,

Plaintiff-Appellant,

versus

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 29, 2019)

Before WILLIAM PRYOR, MARTIN and NEWSOM, Circuit Judges.

PER CURIAM:

Lisa Bostick appeals the judgment in favor of her insurer, State Farm Mutual Automobile Insurance Company, and against her complaint that she was wrongfully denied underinsured motorist benefits. Bostick challenges the dismissal of a juror during jury deliberations. Following a hearing, the district court excused the juror based on evidence that he was dangerous and disruptive. Because a district court can excuse a juror during deliberations for good cause, Fed. R. Civ. P. 47(c), and juror misconduct constitutes good cause, *id.* advisory committee's note to 1991 amendment, we affirm.

## I. BACKGROUND

After a nine-day trial, the jury retired to deliberate on Friday at 3:46 p.m. At 6:20 p.m., a court security officer reported that a female juror had complained about a male juror being "forceful." The officer also gave the district court a note from the male juror who requested "input" about what to do because "we all are not agreeing on the claim," "they feel that they can do this without my vote," "Not [sic] is going to change my vote," and "them harassing me is just making it no better." With the parties' assent, the district court judge instructed the jury about "the importance of respecting each other and working with each other," he asked that they "decide as a group" whether "to continue deliberating this evening . . . or . . . to come back on Monday morning," and he allowed the two jurors to voice their concerns to him separately in his chambers.

The district court told the parties that the two jurors were "having some disagreements" about "the way [opinions were being] expressed" and that "the language that was used" suggested a "lack of respect." The district court also stated that Juror Samelton, who had submitted the note, had reported he could not return on Monday due to "an appointment" that he did "not want to move . . . again." The district court posted a court security officer outside the jury room and offered to instruct the jury to continue its deliberations. *See Allen v. United States*, 164 U.S. 492, 501–02 (1896).

While the parties discussed the matter, a third juror asked to speak with the judge. The third juror reported that Samelton had disagreed with the other six jurors about "something" and had "threatened to swing" at some jurors. When the district court shared this report with the parties, counsel for Bostick thought it "prudent . . . to allow [the jurors'] temperaments to calm" over the weekend and, if Samelton returned "on Monday and continue[d] to create the disturbance," to decide then whether to excuse him from the jury. The parties then agreed to allow the jury to return on Monday to continue their deliberations.

The district court recalled the jury to the courtroom and informed them, due to the late hour, that they could resume deliberations on Monday. The district court asked if any jurors could not return, and Samelton raised his hand, but after further

3

questioning, he said he could come around 11:00 a.m. At the request of the other jurors, the district court decided to resume deliberations at 9:00 a.m.

All seven jurors returned on Monday morning. At 9:40 a.m., the district court informed the parties that further problems required interviewing each juror and that it had posted court security officers outside the jury room. The district court stated that it had "already received several notes" that morning, that two of the jurors wrote that Samelton on Friday had confronted a male juror "chest to chest and threatened to punch him out," and that one juror wrote that Samelton had "used racist language." The district court also read aloud a note from Samelton stating that the jury "[thought] that as a group they have the right to treat me, talk to me, and do whatever to me, they got that . . . wrong" and "it's up to me . . . to remind them that that's not going to happen."

When interviewed separately, the jurors stated that Samelton had insulted and alarmed them during their deliberations on Friday and that they "did not want to go there" on Monday. Five jurors speculated that Samelton's behavior was due to his embarrassment in having the other jurors vote against his request for a different daily trial schedule and due to not being elected as the jury foreperson. Three jurors stated that, soon after deliberations began on Friday, Samelton disagreed with the other jurors, he was belligerent, and he goaded jurors to "Swing on me." One juror said that Samelton remarked "he was going to hit someone,"

4

that he received the response, "If that's what you need to do, go ahead," and that he replied, "Well, I've been in jail before, so it doesn't matter." Four jurors stated that Samelton used obscenities like "F-U," and two of those jurors elaborated that Samelton was "verbally abusive," called each juror "stupid" in a different way, referred to the female jurors as "bitches," and used "racially abusive" language and "slurs," like calling the Caucasian jurors "white asses." And two jurors stated that everyone was frightened of Samelton because he was "big" and that he caused the female jurors to cry.

The jurors also stated that Samelton was uncooperative. Three jurors stated that on Friday Samelton interrupted and ignored jurors who tried to discuss the case with him and that on Monday morning Samelton refused to deliberate. Four jurors stated that Samelton laid on the couch during most of their deliberations, he rebuffed fellow jurors' repeated requests for him to explain his decision, he said he "d[id]n't want to follow the instructions," and when urged several times to consider the law, he responded, "I don't care." One juror recounted that Samelton had stated, "This is what I want, and either you guys accept it or it's going to be a mistrial," and another juror recalled Samelton saying, "You guys can't do anything without me." When questioned by Bostick's attorney, one juror volunteered that "we feel that six of us can definitely . . . finish the deliberations in 15 minutes"

5

without Samelton, and a second juror responded affirmatively when asked if "the six can reach a verdict pretty quickly."

Before Samelton entered the courtroom, counsel for State Farm expressed concern that Samelton would "intentionally say something to create a mistrial situation" and suggested excusing him for "juror misconduct" under Federal Rule of Civil Procedure 47(c) based on the jurors' statements "that he's physically intimidating to the other jurors, that he's intentionally disregarding the law, [and] that his behavior is motivated out of malice." Bostick's attorney also expressed concerns about Samelton's conduct and described the pejoratives he used to refer to women as "horrifying." Even so, Bostick's attorney asked that questioning continue to ensure that Samelton was not "being isolated because he's the holdout and they don't like that." But when asked if he had "a position" on excusing Samelton, Bostick's attorney responded, "No."

When the district court questioned him, Samelton stated that he was frustrated on Friday "about . . . people trying to sway me a certain way" and added, "I'm too big of a human being for you to try to physically force me to do anything, and so that was the issue that I had." When asked if he could continue deliberating, Samelton answered, "I doubt it. No." Samelton likened his situation to being the one "hammer" that isn't "pounding . . . the one-ton nail . . . deeper into the hole until it gets to the point you can't pull it out . . . ." Samelton also answered "no"

when Bostick's attorney asked whether he would deliberate if "you guys . . . go back and restart." Samelton denied that the stalemate was due to "personalities in the room" and responded affirmatively when asked if he had "a cooperative relationship with the[] other jurors."

Bostick's attorney objected to Samelton's removal, but the district court responded that it had to protect the other jurors from physical harm and found it doubtful that deliberations could resume in the light of "the words that the women say were used" and the jurors' "complain[ts] about what they perceived to be racist comments." Bostick's attorney asserted that "the seven jurors are still, in theory, capable of deliberating," but the district court reiterated that jurors had stated "they feel threatened" and had been insulted.

The district court excused Samelton from the jury. The district court told Samelton that he was being dismissed "because of the things I've heard that have concerned me" and his use of "an ugly term" to refer to women. Samelton denied "talk[ing] like that," but when the district court judge said, "I just can't have people feeling concerned," Samelton responded, "I understand that part."

The district court told the jurors that Samelton had been excused and instructed them to "resume your deliberations and try to reach a verdict if you can." After the jury retired to deliberate, the district court asked the parties if there

was "[a]nything else," and each party responded, "No, Your Honor." The jury returned a verdict in favor of State Farm.

Bostick filed a postjudgment motion to interview jurors and later moved for a mistrial, but the district court denied both motions. The district court ruled that it had "already allowed counsel to interview each juror," that "it would be redundant to repeat the inquiry," and that there was no reason to disturb the jury's verdict.

Bostick also moved for a new trial, which the district court denied. Bostick argued that "[t]he jury should have been discharged and a mistrial declared when it became apparent that a physical altercation had occurred or was imminent" because "the deliberative process had soured" and there was "no nonprejudicial way to determine whether the holdout [was] acting in self-defense or [was] an aggressor." Alternatively, Bostick argued, "[a]t a minimum, an Allen charge should have been given." The district court ruled that it had good cause to excuse Samelton for "engag[ing] in misconduct . . . that [caused] the other jurors . . . [to] fear for their physical safety." The district court referred to the "juror interviews demonstrat[ing] that Mr. Samelton was refusing to follow the Court's jury instructions, infecting the jury deliberation with the use of racial slurs, calling female jurors 'bitches' and other pejorative terms, using physical violence or threats against other jurors, and engaging in other gravely inappropriate conduct." The district court stated that it "did not remove Mr. Samelton because he was a

8

'holdout juror'" and that it "would have given [an] *Allen* charge" had it "believed that Mr. Samelton could continue deliberating without physically harming and intimidating the other jurors. The district court explained that it "excused Mr. Samelton as a last resort."

## II. STANDARDS OF REVIEW

We apply two standards of review in this appeal. The removal of a juror for good cause is subject to review for abuse of discretion. Federal Rule of Civil Procedure 47(c) states plainly that, "[d]uring trial or deliberation, the court *may* excuse a juror for good cause." Fed. R. Civ. P. 47(c) (emphasis added); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018) ("use of the word 'may' certainly confers discretion"). Determining whether a juror has engaged in misconduct involves "a finding of fact that we review for clear error." *United States v. Augustin*, 661 F.3d 1105, 1129 (11th Cir. 2011) (quoting *United States v. Abbell*, 271 F.3d 1286, 1302–03 (11th Cir. 2001)) (ellipses omitted).

## III. DISCUSSION

Federal Rule of Civil Procedure 47(c) allows the district court "in appropriate circumstances [to] excuse a juror during the jury deliberations without causing a mistrial." Fed. R. Civ. P. 47(c) advisory committee's note to 1991 amendment. "[J]uror misconduct that might occasion a mistrial [is] [an] example[] of [an] appropriate ground[] for excusing a juror." *Id.* When determining whether

9

sufficient cause exists to dismiss a juror, the district court has broad discretion to dictate the scope of its investigation and to decide whether to interview jurors. *See Augustin*, 661 F.3d at 1133; *United States v. Register*, 182 F.3d 820, 840 (11th Cir. 1999) (stating the district court "enjoys substantial discretion in 'choosing the investigative procedure to be used in checking for juror misconduct . . . .'"). "[W]e will reverse the district court only if we find that it discharged the juror without factual support, or for a legally irrelevant reason." *Abbell*, 271 F.3d at 1302 (quoting *Register*, 182 F.3d at 839). A district court may excuse a juror during deliberations for good cause, Fed. R. Civ. P. 47(c), and juror misconduct constitutes good cause, *id.* advisory committee's note to 1991 amendment.

The district court was entitled to find that Juror Samelton engaged in misconduct. Jurors stated that Samelton intimidated them by threatening to use physical violence against them and by confronting one juror, that he belittled them using gender-specific and racial epithets, and that he refused to follow the jury instructions or to deliberate. Even Bostick's attorney described Samelton's language as "horrifying." And we have affirmed excusing jurors for misconduct less egregious than Samelton's. For example, we agreed that removal was appropriate based on a juror's refusal to deliberate, use of obscenities, and insistence on basing her decision on her feelings instead of the evidence and the law, *Augustin*, 661 F.3d at 1129–34, and based on a juror's refusal to consider the

10

evidence or to discuss the applicable law, *Abbell*, 271 F.3d at 1302–04. The district court had good cause to excuse Samelton from the jury.

Bostick argues that Samelton's behavior warranted a mistrial, but Rule 47(c) serves as a safeguard. As stated in the advisory committee note to Rule 47(c), "misconduct that might occasion a mistrial . . . [provides an] appropriate ground[] for excusing a juror." Fed. R. Civ. P. 47(c) advisory committee's note to 1991 amendment.

Bostick argues that Samelton was removed because he was a holdout juror, but we disagree. "It is not grounds for the dismissal of a juror that the juror refuses to join with fellow jurors in reaching a unanimous verdict," *id.*, but the district court "excused Mr. Samelton as a last resort because [it] believed that he was going to physically harm other jurors." That decision was based on "[t]he juror interviews demonstrat[ing] that Mr. Samelton was refusing to follow the Court's jury instructions, infecting the jury deliberations with racial slurs, calling female jurors 'bitches' and other pejorative terms, using physical violence or threats against other jurors, and engaging in other gravely inappropriate conduct." And Samelton intimated that he would not hesitate to use force. He stated that he would "remind" his fellow jurors to pay attention to him and that he was "too big of a human being" to be overlooked.

11

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of State Farm Automobile Insurance Company.