RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

> No. 21-1329

ANTHONY OISONI OZOMARO,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cr-00081-1—Hala Y. Jarbou, District Judge.

Argued: June 7, 2022

Decided and Filed: August 11, 2022

Before: STRANCH, DONALD, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant. Erin K. Lane, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant. Erin K. Lane, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

BERNICE BOUIE DONALD, Circuit Judge. Following two days of evidence, two days of deliberations, and two composed juries, defendant appellant Anthony Ozomaro was convicted of possessing with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1)

and (b)(1)(A)(viii).  On appeal, Ozomaro seeks a new trial based on assertions of improper removal and replacement of a deliberating juror or, in the alternative, a new sentencing hearing due to an allegedly improper sentencing enhancement.  For the following reasons, we affirm.

## I.

On April 10, 2019, Ozomaro was indicted on one count of possessing with intent to distribute fifty grams or more of methamphetamine.  Ozomaro pled not guilty, and the district court appointed him counsel.  Four months later, counsel moved for a competency evaluation.  Counsel alleged that Ozomaro was having "delusional thoughts" and providing "highly irrational" responses to basic questions.  The court found "reasonable cause to believe that [Ozomaro] may presently be suffering from a mental disease or defect rendering him mentally incompetent," and referred him to a forensic psychologist for evaluation.  The psychologist noted that "Ozomaro presented with beliefs that were not typical" and diagnosed him with "Unspecified personality disorder with antisocial and schizotypal traits."  However, the psychologist ultimately found that Ozomaro was able to understand the nature of the proceedings against him, and thus, competent to stand trial.  The district court issued an order finding the same.

In February 2020, defense counsel moved to withdraw because Ozomaro disagreed on how to proceed with the case and wished to represent himself.  Following a hearing on the motion, the district court determined that Ozomaro knowingly, intelligently, and voluntarily waived his right to counsel.  The court allowed Ozomaro to proceed *pro se*, but ordered counsel to serve as standby counsel.  The court then scheduled a final pretrial conference for April 28, 2020.

In the meantime, Ozomaro moved to dismiss the case for lack of jurisdiction.  He argued:

Eye am demanding imediate dismissal of underlining quote 'criminal offense,' Eyam being charged with.  Eye am not a 'Pupil' of the United State and am not subject to United State Jurisdiction.  The Underlined 'Criminal Offense' Eye am being "charged" with is a Extraterritorial event and Iam demanding my Extraterritoriality.  Eye am further more demanding my release from this United State banking institute, where eye am illegally being held for financial gain

against my will. Eye will no longer be complying with 'United States' 'Govern-mental' (Mind Control) Programing or proceedings.

Ozomaro again raised the issue of jurisdiction at the April 28 pretrial conference. The district court denied his motion and stated, "We will, in fact, go to trial next week Tuesday." Ozomaro immediately replied, "I won't be there." When the court asked for any other preliminary matters, Ozomaro again stated, "I told you I am not going to trial." Ozomaro repeated this sentiment several times throughout the remainder of the conference. Finally, the court warned, "You don't intend to be here. I do expect that you will be here–either by force or your own volition. You are going to have to make up your mind between now and a week from tomorrow." Ozomaro replied, "They are forcing me. I am not going to be here." On June 16, the day set for trial, Ozomaro refused to leave his holding cell. In Ozomaro's absence, the district court released the jury venire and adjourned trial until October 20.

On October 20, Ozomaro appeared and announced his readiness to proceed. The district court conducted voir dire and asked the prospective jurors a series of open-ended questions, including whether anything would prevent them "from being fair and impartial to either side" and whether anyone held "negative opinion[s] about police in general or the criminal justice system as a whole." None of the jurors answered affirmatively, and neither party challenged a juror for cause on those bases. Following peremptory challenges from the parties, the court empaneled twelve jurors and two alternates.

The government presented its case over the course of two days, after which the jury retired to deliberate. After six hours of deliberations, the district court received a note stating, "We have not reached an agreement. We cannot come to a unanimous decision." The court gave an Allen instruction, and the jury returned to deliberations. Less than two hours later, the jury sent another note stating, "We are unable to reach a unanimous decision today. We would like all transcripts of the witnesses for deliberation 10/23/2019." The court informed the jurors that official transcripts were not available, and instructed them to continue deliberations the following day.

The next morning, the district court informed the parties of new developments that occurred overnight. First, one of the jurors had informed a court staff member that she observed

a male juror drinking alcohol during lunch two days prior.  The juror also stated that "the same individual hates the Government and doesn't believe anything they say."  Second, another juror had called the district court chambers to ask if "it was legal to drink on lunch break," and commented that "a juror openly admitted bias to the Government."

Over Ozomaro's objection, the court separately questioned each juror to determine the extent of the alleged misconduct.  At the beginning of each interview, the judge cautioned, "I don't want to know anything about the state of the deliberations . . . or how your voting stands."  The judge then continued to ask some variation of the following questions:  "Have you participated in, observed, or heard any misconduct either by yourself or another juror?" and "Have there been any actions or statements that violate your oath as a juror or that is different from what was said in open court during voir dire as to your oath and your responsibilities?"  Seven of the twelve jurors answered affirmatively.

Juror 33 reported that she observed another juror drinking "what looked like a 24-ounce beer" during lunch.  Juror 33 also stated that the same juror "explained [during deliberations] that he does have bias [against] police officers."

Juror 19 relayed that one of the jurors made a "comment [outside of deliberations] . . . that they did not trust a couple of the people involved in the search."  Juror 19 further explained, "For me it felt like if this person had that distrust that was the point of the interview process when we first came in, and it's like, why–if they have that distrust that's not based on the evidence, why are they here?"

Juror 46 stated that during a break in the trial, another juror had commented "that [a third juror] had an alcoholic beverage during lunch one day."

Juror 31 expressed concern that, based on a comment during deliberations, one of the male jurors "can't be fair and impartial to one side or the other."  Juror 31 stated that the comment related to "that person's assessment of the credibility of the witnesses," but felt that it violated their oath because "we were instructed . . . to maybe not put into personal feelings toward an individual . . . ."

Juror 114 reported that one of the jurors "refus[es] to uphold the law as it reads." Juror 114 further relayed that the same juror stated, "You cannot trust the police. They will make everyone look guilty. Any evidence provided by the police should not be trusted." and "I hate the Government." Juror 114 also added that the same juror consumed a twenty-ounce beer during lunch two days prior.

Juror 83 observed another juror "not being impartial regarding the Government's witnesses" during deliberations.

Juror 99 reported that one of the jurors "might be a little bias[ed] . . . for the Defendant" based on comments made during deliberations. Juror 99 clarified that "it's mainly the credibility of different witnesses that have been questioned," specifically "all of the law enforcement officers."

It became clear through the interviews that the jurors were referring to Juror 109, who himself reported no instances of misconduct.

Based on these accounts, the district court excused Juror 109. The court found that the consumption of alcohol did not constitute "good cause" to excuse the juror. It reasoned that "the [jurors who] observed it all talk about a 20-ounce drink or maybe a 24-ounce drink . . . I didn't hear anything that would indicate that it was so much consumption that it would affect any sort of deliberations." However, the court determined that the bias against the government and the lack of candor to the court constituted "good cause" to excuse the juror. The court found that "it's not a credibility of these particular witnesses[,] . . . [but] a bias in general against certain witnesses and evidence[.]" The court further explained, "after taking two oaths, . . . this same juror was not truthful in voir dire to the Court as it relates to that bias, nor was he truthful to the Court this morning as it relates to that bias." The court then replaced Juror 109 with an alternate juror and instructed the jury "to start completely brand new." Approximately three hours later, the jury returned a guilty verdict. The district court subsequently sentenced Ozomaro to 168 months' imprisonment, and this timely appeal followed.

**II.**

Ozomaro first argues that the district court violated his rights to a fair and impartial jury by removing Juror 109 and substituting an alternate juror after nearly eight hours of deliberations. Ozomaro alleges that the other jurors wanted Juror 109 removed because he was the lone holdout juror.

Federal Rule of Criminal Procedure 23(b)(3) empowers the district court to excuse a juror for "good cause," and Rule 24(c)(1) allows the district court to "replace any jurors . . . who are disqualified from performing their duties." The decision to replace a juror is entrusted to the sound discretion of the district court "whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *United States v. Gabrion*, 648 F.3d 307, 338 (6th Cir. 2011) (citing *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972)), *rev'd en banc on other grounds*, 719 F.3d 511 (6th Cir. 2013). We "will not disturb the judge's finding on appeal except for a want of any factual support or for a legally irrelevant reason." *United States v. Gjokaj*, 555 F. App'x 581, 585 (6th Cir. 2014) (internal quotation marks omitted) (quoting *United States v. Coleman*, 997 F.2d 1101, 1106 (5th Cir. 1993)).

As a preliminary matter, Ozomaro contends that the district court conducted an inadequate and incomplete hearing regarding the alleged juror misconduct. But the scope of investigation into a juror's ability to remain impartial is committed to the sound discretion of the district court, and we have never required a hearing before removing a juror whose ability to remain impartial is under question. *Id.* at 585. "All that is needed to satisfy a prudent exercise of discretion is to be certain the trial court had sufficient information to make an informed decision[.]" *United States v. Jones*, 747 F. App'x 348, 356 (6th Cir. 2018) (quoting *United States v. Reese*, 33 F.3d 166, 173 (2d Cir. 1994)). Although the district court here could have asked more pointed questions, a review of the record shows a sufficient factual inquiry from which to find good cause.

Ozomaro next argues that the district court did not carefully discern general bias from credibility issues in determining "good cause." The proper standard for determining "good

cause" is not a settled issue in this circuit. It is well established that a district court may remove a juror for instances of misconduct, including bias, an inability to follow instructions, or a lack of candor under oath. *See Wofford v. Woods*, 969 F.3d 685, 701-05 (6th Cir. 2020) (recounting the history of juror removal and the role of the trial judge). However, it is equally well established that a district court may not remove a juror based on their doubts about the sufficiency of the government's evidence. *Id.* "[T]he reasons underlying a request for a dismissal will often be unclear." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). To avoid the danger that a juror will be discharged based on their view of the evidence, the D.C. Circuit crafted a prophylactic evidentiary standard for the district court to employ in making its determination: "[I]f the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Id.* (emphasis added).

A decade later, the Second and Ninth Circuits addressed the same issue. The Second Circuit adopted the *Brown* rule in its entirety. *See United States v. Thomas*, 116 F.3d 606, 622 (2d Cir. 1997). The Ninth Circuit adopted a slightly modified version of the *Brown* rule, holding that "if the record evidence discloses any *reasonable possibility* that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999) (emphasis added). The court emphasized "that the standard is any reasonable possibility, not any possibility whatever. It may be that '[a]nything is possible in a world of quantum mechanics.'" *Id.* n.5 (alteration in original) (quoting *United States v. Watkins*, 983 F.2d 1413, 1424 (7th Cir. 1993) (Easterbrook, J., dissenting)).

In the following years, the Eleventh and Third Circuits weighed in on the debate. The Eleventh Circuit adopted a second variation of the *Brown* rule, holding that "a juror should be excused only when no '*substantial possibility*' exists that she is basing her decision on the sufficiency of the evidence." *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001) (emphasis added). The court explained that "this standard [is] basically a 'beyond a reasonable doubt' standard." *Id.* The Third Circuit noted that the slight difference in standards "is one of clarification and not disagreement," but adopted the *Symington* and *Abbell* standards "[t]o the

extent that there is a difference." *United States v. Kemp*, 500 F.3d 257, 304 (3d Cir. 2007).  It held that "district courts may discharge a juror for bias, failure to deliberate, failure to follow the district court's instructions, or jury nullification when there is no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence." *Id.*  The court found, "That standard will allow us to avoid abstract 'anything is possible' arguments, provide district courts with some leeway in handling difficult juror issues, and protect each party's right to receive a verdict rendered by a jury that follows the law." *Id.*

Although this Court has never expressly delineated a "good cause" standard, we touched on the issue in *United States v. Patterson*, 587 F. App'x 878, 888-91 (6th Cir. 2014).   In *Patterson*, Juror 6 said nothing in response to the following during voir dire:  (1) questions about whether any jurors were "having an on-going issue relating to drugs, whether themselves or close friends, relatives, members of their church they're very close to, anything like that"; (2) inquiries as to whether any juror "had their life touched by drugs or drug abuse or addiction or anything like that"; and (3) the statement that, "if there's something that strikes too close to home about drugs, then that's something that we would need to know about." *Id.* at 889.  The government chose not to exercise a peremptory strike against Juror 6, and she was subsequently empaneled on the jury. *Id.*  During the second day of deliberations, the foreperson sent a note to the judge which stated:

> Judge Nixon, one of the Jurors overheard a fellow Juror commenting on having prior information about drug dealing that she did not reveal during Jury selection. I feel that this prior information could perhaps be influencing her ability to reach a fair decision and should have been made known during the selection process. Thus, can we consider removing this Juror and using one of the Alternates?

*Id.* at 896 (Cole, J., concurring in part).  Faced with these allegations, the district court conducted interviews of the relevant jurors. *Id.* at 889.  Statements from the jurors, including Juror 6 herself, indicated that she knew people who used drugs and "it was prejudicing [her] against this trial." *Id.*  Based on this information, the court removed Juror 6 and replaced her with an alternate. *Id.*

On appeal, a divided court affirmed.  The majority determined that the jurors' request to remove Juror 6 did not stem from her views of the case, but rather from her lack of candor during

voir dire. *Id.* at 890. The majority found that the jurors' statements did not indicate a disagreement with Juror 6's views of the merits or a dissatisfaction with her defense of her views. *Id.* The majority thus concluded that nothing in the record showed the district court was even aware of Juror 6's disposition, let alone removed her because of it. *Id.* Accordingly, the majority held that Juror 6's lack of candor constituted good cause for removal and that the remarks of the jurors offered "no reasonable indication that the request for her discharge stemmed from her view of the merits." *Id.* at 889. The dissent disagreed, reasoning that there was "a real possibility that the foreperson requested Juror 6's removal due to her view of the sufficiency of the government's evidence (i.e., because she was a 'holdout' juror)." *Id.* at 894 (Cole, J., concurring in part).

Today, we clarify our decision in *Patterson* and expressly adopt the "reasonable possibility" standard set forth by our sister circuits in *Symington* and *Kemp*. Applying this standard here, Ozomaro cannot meet his burden. On the morning before the second day of deliberations, the district court revealed that two jurors had contacted court staff and expressed concerns of juror misconduct. The judge interviewed each juror individually on the record, and six jurors reported that Juror 109 expressed bias against the government. Three jurors unequivocally described a general bias against the government; two jurors stated that Juror 109 made comments related to the credibility of the witnesses but later clarified that the distrust was "not based on the evidence" and resulted instead from "personal feelings toward an individual"; and one juror described an unfavorable credibility determination against an entire category of witnesses—the law enforcement witnesses. Notably, however, none of the jurors reported that Juror 109 distrusted a specific witness or found specific portions of the testimony not credible. And although it became clear that Juror 109 was a holdout juror, there was no evidence that the discharge requests stemmed from that fact. Therefore, the district court was well within its discretion in concluding that there was no reasonable possibility that the discharge stemmed from Juror 109's views of the case. Accordingly, the district court had "good cause" to excuse Juror 109 for bias and lack of candor to the court.

If a district court properly replaced a juror for good cause, then reversal is warranted only "on a clear showing that [the defendant] was prejudiced by the juror's being excused." *Jones*,

747 F. App'x at 355 (citing *United States v. Warren*, 973 F.2d 1304, 1308 (6th Cir. 1992)).  The Eleventh Circuit has set forth several relevant factors for determining prejudice:

> the length and complexity of the trial; the amount of time the jury had deliberated before a juror was removed; the steps that the district court took to ensure that the alternate had not been exposed to extrinsic information about the case; and whether the remaining jurors began their deliberations anew after the alternate was substituted.

*United States v. Oscar*, 877 F.3d 1270, 1289 (11th Cir. 2017).

This case was relatively simple—it involved one defendant, one count, and less than two full days of testimony.  Throughout the trial, the district court admonished the jury to consider only the evidence seen and heard in court.  Before the jury retired to deliberate, the court "excuse[d] the two alternate jurors," ordered them to remain in a separate place, and instructed them not to further discuss the case.  The jury then deliberated for almost eight hours before Juror 109 was removed.  Following the substitution of the alternate juror, the court instructed the jurors "to start completely brand new."  Ozomaro presented no evidence that the alternate juror was biased or unable to render an impartial verdict.  After two and a half hours, the jury requested to see three exhibits, and thirty-one minutes later, the jury returned a guilty verdict.  Under these circumstances, we cannot say that the district court abused its discretion in dismissing Juror 109 for good cause or replacing him with an alternate.

Ozomaro makes one final attempt to overturn his conviction.  He argues that the district court violated his due process rights by rereading the "duty to deliberate" instruction without including the government's burden of proof beyond a reasonable doubt.  This argument is factually inaccurate.  The district court specifically instructed the jurors to "[l]isten carefully to what the other jurors have to say and then decide for yourself if the Government has proved the Defendant guilty beyond a reasonable doubt."  Therefore, we cannot say that the district court erred in instructing the jury to begin its deliberations anew.

**III.**

Next, Ozomaro contends that the district court erroneously applied a two-level sentencing enhancement for obstruction of justice based on his refusal to leave the holding cell and appear for the original trial on June 16, 2020.

The Sentencing Guidelines allow the district court to increase a defendant's base offense level when:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. The application notes provide that a defendant obstructs or impedes the administration of justice when he "willfully fail[s] to appear, as ordered, for a judicial proceeding." *Id.*, cmt. n.4(E). We review *de novo* the determination of whether specific facts constitute an obstruction of justice. *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012).

Here, the district court determined that "Ozomaro's behavior from the very beginning in this case has been to delay." The court found that his plan came to fruition when he made the conscious decision to not leave his holding cell and appear for trial. Ozomaro is correct that his pretrial incarceration creates an unusual situation. However, we are not the first circuit to address the applicability of § 3C1.1 under these circumstances. *See United States v. Perkins*, 787 F.3d 1329 (11th Cir. 2015).

In *Perkins*, the defendant refused to leave his holding cell on the day of trial, saying "What if I don't defend? What if I'm not a defendant? Where is your defendant? How can you have a defendant if I'm not here to defend anything?" *Id.* at 1335. The district judge met with the defendant and tried to persuade him to enter the courtroom, but to no avail. *Id.* at 1336. The defendant further threatened that he would go "kicking and screaming" if the marshals tried to force him to go to the courtroom. *Id.* On this record, the Eleventh Circuit found that the defendant "willfully failed to appear for his trial despite the district judge's repeated efforts to

persuade him to attend." *Id.* at 1341. The court determined that the defendant "willfully set out to clog the gears of the judicial process," and thus, his actions fell within the scope of § 3C1.1. *Id.*

The same can be said here. A review of the record shows that Ozomaro continuously acted with the purpose of avoiding trial. Earlier in the proceedings, Ozomaro invoked his right to self-representation which necessitated his appearance at trial. At the final pretrial conference, after the court denied his motion to dismiss, Ozomaro persistently stated he would not go to trial and threatened, "They are forcing me. I am not going to be here." On June 16, the day set for trial, Ozomaro followed through with his earlier sentiment and refused to leave his holding cell. Without Ozomaro's participation at trial, the venire had to be dismissed and the trial adjourned for over four months. Under these circumstances, the district court did not err in finding that Ozomaro's actions constituted an obstruction of justice for purposes of § 3C1.1.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's judgment of conviction and sentence.