NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0125n.06

No. 25-5207

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Mar 11, 2026

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | ON APPEAL FROM UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | KENTUCKY |
| TEVYE TYSHEAR SHELTON JONES, | ) | |
| Defendant - Appellant | ) | OPINION |
| | ) | |

_____

Before: CLAY, GIBBONS, and HERMANDORFER, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Tevye Jones was convicted of two counts of possession with intent to distribute illegal narcotics in violation of 21 U.S.C. § 84l(a)(l), one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(l)(A), and one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(l). In this appeal, Defendant asks us to overturn his § 84l(a)(l) drug possession convictions and to grant him a new trial on any remaining charges. For the reasons explained below, we **AFFIRM** his convictions on all four counts.

## I. FACTUAL BACKGROUND

Around 10:30 pm on November 30, 2023, Fayette County Deputy Sheriff Nathaniel Wakefield attempted to conduct a routine traffic stop of a car with an expired tag that he determined was registered to an individual named Quentin Leavell who held a suspended out-of-state license. After Deputy Wakefield activated his cruiser's lights, the car, instead of acquiescing to the traffic stop, "accelerated through the red light" and sped away. Transcript, R.59, PageID #479-80.

Deputy Wakefield gave chase, and the driver eventually lost control of the car and hit a light pole, which flipped the car onto its side.

When he approached the vehicle, Deputy Wakefield observed its three occupants attempting to kick the car's front windshield out. Two of the occupants were able to exit the vehicle and flee the scene. But the car's driver, who turned out to be Defendant Tevye Tyshear Shelton Jones, was unable to extricate himself before Deputy Wakefield's arrival. When Jones did eventually exit the vehicle, Deputy Wakefield observed a firearm fall from his person onto the ground.

Deputy Wakefield then detained Jones and searched a bag that Jones was carrying. The bag, which Jones confirmed belonged to him, contained ten individually wrapped plastic baggies of what testing would later reveal to be fentanyl, methamphetamine, and cocaine. Deputy Wakefield and other officers arrested Jones at the scene.

## II. PROCEDURAL BACKGROUND

A federal grand jury indicted Jones on four counts: possession with intent to distribute mixtures or substances containing fentanyl in violation of 21 U.S.C. § 84l(a)(l) (Count 1); possession with intent to distribute mixtures or substances containing methamphetamine and cocaine also in violation of § 84l(a)(l) (Count 2); possession of a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(l)(A) (Count 3); and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(l) (Count 4). The case proceeded to a two-day trial, at the conclusion of which Defendant was found guilty on all counts. The district court sentenced him to 180 months' imprisonment.

The facts and procedural history relevant to this appeal are set forth below.

## A. Testimony of Matthew Evans

On the second day of the trial, the government called police detective and FBI drug Task Force member Matthew Evans to testify about common drug trafficking practices. Defendant objected under Federal Rules of Evidence 401 and 403, arguing that, because Officer Evans lacked any personal knowledge about the events of this case, any testimony he provided would be minimally probative but highly prejudicial.

The government responded that Officer Evans would "testify[] essentially as an expert witness regarding his experience and . . . knowledge of" drug trafficking. Transcript, R. 60, PageID #629. Defendant again objected and stated that the government had not disclosed Officer Evans as an expert. The government pointed out that they had disclosed Officer Evans as a prospective witness, provided his resume and qualifications to the defense, and described the topics on which he intended to testify.

The court ruled that Officer Evans could testify, without explicitly stating whether he would testify as an expert witness or a lay witness. However, while finalizing jury instructions, the parties mutually agreed to instruct the jury to treat Officer Evans' testimony as expert testimony.

## B. Judgment of acquittal

At the close of the government's case, which was also the close of all evidence, Defendant moved for a judgment of acquittal, arguing that the evidence presented by the government was insufficient to convict him of possessing illegal narcotics with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He argued that there was insufficient evidence to prove that he possessed the substances that were ultimately determined to be narcotics because the only lab report showing that those substances had tested positive for drugs displayed the name "Quentin Leavell," not "Tevye Jones." The district court considered the evidence presented in the light most favorable to

government and determined that there was sufficient evidence for a jury to find Defendant guilty of possessing the narcotics.

### C. Motion for Mistrial

The jury began deliberations following the close of trial. After deliberating for approximately two hours, the jury sent several notes to the court. First, the jury as a whole asked the district court: "In regards to the verdict form, do we put a check mark next to the verdict, or the number of jurors that voted for that verdict?" Jury Notes, R. 29, PageID # 126. The district court instructed the jury to put a check mark in the line indicating their verdicts. A second note informed the court that "[Juror] 741 would like to be relieved and replaced by one of the alternates." *Id.* at PageID #124. The court initially denied this request, stating that it could not replace a juror absent extraordinary or emergency circumstances. However, Juror 741 sent yet another note stating that he wanted to be relieved "based upon disagreement of following judge's rule/law." *Id.* at PageID #123. Juror 741 further claimed that "he did not hear the initial statements during jury selection and wishes not [to] commit perjury." *Id.* The court interpreted this to mean that Juror 741 had not heard or understood the Judge's initial instructions about the importance of following the law, but that, once made aware of that instruction during deliberations, felt he could not comply.

The defense, the prosecution, and the court all agreed that Juror 741 needed to be removed. Defendant moved for a mistrial because he believed that removing the juror and attempting to begin deliberation anew with an alternate would "poison[] the jury." Transcript, R. 60, PageID #735. The government disagreed, arguing that Juror 741's request constituted an extraordinary circumstance because he stated that he could not follow the law. The court spoke with Juror 741,

who confirmed that he could not continue to serve on the jury. The court then dismissed Juror 741 without ruling on Defendant's motion for a mistrial.

The following day and before renewed deliberations began, Defendant again moved for a mistrial, stating his concern that, with the eleven original jurors remaining, the newly constituted jury would not be able resume its deliberations with a blank slate. Defendant also explained his concern that Juror 741's request to be excused following hours of deliberations, "ha[d] . . . hallmarks of a deadlocked jury" and demonstrated that "Juror 741 was unconvinced" of Defendant's guilt, "but was tired of braving that fight" against the other jurors who wanted to convict. Transcript, R. 37, PageID #283.

The court questioned the original eleven jurors and determined that they could set aside prior opinions and begin deliberations anew. It also spoke with the alternate juror who promised to hold the other jurors to their obligation to begin deliberations anew. The court thus denied Defendant's motion for a mistrial and substituted Juror 741 with the alternate.

Before deliberations resumed, the court explicitly informed the jury that it needed to "begin . . . deliberations anew. That means for those of you who were with us yesterday that you should set aside the discussions that you had and that you should start over with a clean slate. Listen to what your fellow jurors have to say and begin over again." *Id.* at PageID #315. The jury thus resumed deliberations and delivered its guilty verdict over an hour later. Defendant again renewed his motion for a mistrial, which the court denied.

**D.  Motion for a New Trial**

Following the trial's conclusion, Defendant timely filed a motion for a new trial, again on grounds relating to the dismissal of Juror 741.[1]  Defendant reiterated his argument that the circumstances surrounding Juror 741's request to be excused from deliberations "contain[ed] the hallmarks of a deadlocked jury," which merited a new trial.  Memo, R. 38-1, PageID #332.  He also argued that the decision to "[i]mplant[] an alternate Juror following an afternoon of deliberations, and asking the Jury collectively to start over" was prejudicial and also provided sufficient grounds for a new trial.  *Id.*

The district court denied Defendant's motion and entered a guilty judgment on February 28, 2025.  Defendant timely filed a notice of appeal on March 12, 2025.  *See* Federal Rule of Appellate Procedure 4(b)(3)(A)(ii) (prescribing a 14-day time limit to file a notice of appeal).

**III. DISCUSSION**

On appeal, Defendant presents two arguments as to why we should grant him a new trial and one argument as to why his possession-with-intent-to-distribute convictions should be overturned.  First, he argues that we should grant him a new trial because the district court's decision to dismiss Juror 741 and replace him with an alternate tainted jury deliberations and deprived Defendant of his right to a fair trial.  He also argues that we should grant him a new trial because Officer Evan's testimony was minimally probative and unduly prejudicial under Federal Rule of Evidence 403 and thus should not have been admitted.  Lastly, Defendant argues that we should overturn his possession-with-intent-to-distribute convictions, Counts 1 and 2, because various problems with the police department's handling of the narcotics recovered from Defendant

---

[1] Although this date was 15 days after the jury's guilty verdict issued on November 14, 2024, the motion fell within the 14-day time period prescribed by Federal Rule of Criminal Procedure 33(b)(2) because November 28 was a federal holiday (Thanksgiving), pushing the deadline to November 29.

at the time of his arrest make it impossible to prove that Defendant actually possessed the narcotics in the first place. For the reasons explained below, we deny Defendant's request for a new trial and affirm his convictions.

## A. Motions for a Mistrial and New Trial

Defendant argues that the district court erred in denying his motions for a mistrial and for a new trial, both of which stemmed from alleged problems with the court's dismissal of Juror Number 741. We review the district court's denial of both motions for abuse of discretion. *United States v. Robinson*, 99 F.4th 344, 360, 366 (6th Cir. 2024). We may grant Defendant a new trial if we determine that the district court committed a "substantial legal error" in denying either motion. *Id*. at 367 (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)). We hold that the district court committed no error in denying Defendant's motions.

### 1. Motion for a Mistrial

We first address Defendant's arguments relating to his motion for a mistrial. District courts may declare a mistrial when the jury is "hopelessly deadlocked." *Bollenbach v. United States*, 326 U.S. 607, 609 (1946). And according to Defendant, the circumstances surrounding Juror 741's dismissal show a deadlock.

We disagree that the record shows that the jury was deadlocked. A review of this Circuit's caselaw indicates that, in virtually all instances where a district court declares a mistrial based on a deadlock, it does so after the jury as a whole explicitly tells the court that it has reached an intractable impasse. In *In re Ford*, 987 F.2d 334 (6th Cir. 1992), for instance, the district court declared a mistrial only after the jury twice reported a deadlock. The jury first informed the court that it was "hopelessly deadlocked and unable to reach a verdict" after two days of deliberations, to which the court responded "that it was too early for them to declare a deadlock and sent the jury

back for further deliberations." *Id.* at 340. After two further days of deliberations and a second report of deadlock, the court declared a mistrial. *Id*; *see also Schledwitz v. United States*, 169 F.3d 1003, 1007 (6th Cir. 1999) ("[T]he Memphis proceedings ended in a mistrial after the jury announced it was hopelessly deadlocked"); *United States v. Capozzi*, 723 F.3d 720, 728 (6th Cir. 2013) (declaring a mistrial after the court "asked each juror individually whether he or she believed that further deliberations might lead to a unanimous decision" and each juror responded in the negative). Indeed, one of the factors we consider in assessing whether a district court abused its discretion in declaring a mistrial is whether the jury collectively agreed that it could not reach a verdict. *See In re Ford*, 987 F.2d at 339; *Capozzi*, 723 F.3d at 728.

In this case, no member of the jury, let alone the jury as a whole, reported a deadlock. Instead, Defendant asks us to infer that a deadlock existed because: (1) the jury asked the court if it needed to "put a check mark next to the verdict, or the number of jurors that voted for that verdict?"; and (2) Juror 741 asked to be relieved "based upon disagreement of following Judge's rule/law." Jury Notes, R. 29, PageID #123, #126. Defendant urges us to deduce that these notes indicate that that the jurors had made up their minds, tallied nonunanimous votes, and found themselves unable to resolve a deadlock. He claims that Juror 741's request for removal "evidences the pressures of a deadlocked deliberation and division amongst Jurors." Appellant Br. at 16.

Defendant's arguments are mistaken. None of the jury's notes come close to clearly stating that the jury had reached an impasse, and any insight they provide into jury deliberations is highly speculative. Indeed, we previously held that "there [was] simply no evidence . . . that the jury was 'hopelessly deadlocked'" after the jury asked the court if it could "mistrial one charge [and] find a verdict on the other." *United States v. Dobbins*, 482 F. App'x 35, 42-43 (6th Cir. 2012). That

question—submitted by the whole jury—explicitly invokes the concept of a mistrial and is stronger evidence of a deadlock than the evidence cited by Defendant in this case. Still, we declined to declare a mistrial. We thus affirm the district court's denial of Defendant's motion for a mistrial in this case.

### 2. Motion for a New Trial

Defendant relatedly argues that that he should have been granted a new trial because (1) Juror 741's request to be excused stemmed from his view on the merits, which is not appropriate grounds for juror dismissal, and (2) the replacement of Juror 741 with an alternate in the middle of deliberations tainted jury deliberations, depriving Defendant of a full and fair trial. We again conclude that the district court made no error in denying the motion for a new trial.

We first address the issue of whether Defendant deserves a new trial because Juror 741 was dismissed for his view on the merits. Federal Rule of Criminal Procedure 23(b) empowers the district court to excuse a juror for "good cause," and Rule 24(c)(1) allows the district court to "replace any jurors who are unable to perform or who are disqualified from performing their duties." "The decision to replace a juror is entrusted to the sound discretion of the district court whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *United States v. Ozomaro*, 44 F.4th 538, 543 (6th Cir. 2022) (cleaned up). We have held that a district court may remove a juror who cannot or will not follow the law. *See Wofford v. Woods*, 969 F.3d 685, 710 (6th Cir. 2020) ("[A] juror who intends to nullify the applicable law is no less subject to dismissal than is a juror who disregards the court's instructions due to an event or relationship that renders him biased or otherwise unable to render a fair and impartial verdict." (quotation omitted)). However, if the "evidence discloses any reasonable possibility that the impetus for a juror's dismissal" after deliberations began "stem[med] from [his]

views on the merits of the case, the court must not dismiss the juror." *Ozomaro*, 44 F.4th at 544 (cleaned up).

We usually decline to find that a juror was improperly removed for his view of the merits unless he made clear statements directly revealing his views on specific legal or evidentiary issues in the case. In *Ozomaro*, the district court removed a juror during deliberations after he openly expressed biased views against the government and communicated to a fellow juror his "unfavorable credibility determination against an entire category of witnesses—the law enforcement witnesses." *Id.* at 546. We held that this removal was proper because nothing in in these statements created a "reasonable possibility that the discharge stemmed from [the juror's] views of the case" or assessment of the merits. *Id.* We emphasized that there was no indication that the juror "distrusted a *specific* witness or found *specific* portions of the testimony not credible"—he had simply declared his general personal biases and convictions. *Id.* (emphasis added).

As in *Ozomaro*, the record in this case simply does not indicate that Juror 741 was removed due to his view of the merits. The note Juror 741 sent to the court stating his "disagreement" with the Judge's "rule/law," Jury Notes, R. 29, PageID #123, along with his response to direct questioning from the court demonstrate only that he asked to be removed because he felt he was unable to follow the law in the discharge of his jury duties.[2] Nothing about the request for removal

---

[2] After Juror 741 asked for removal, the district court, in a colloquy with the juror, asked: "we do need jurors who are willing to follow the law. Are you sure you can't do it?" Juror 741 responded: "No, ma'am, I can't." The court then dismissed him. Transcript, R. 60, PageID #740. Although this was not a terribly probing line of questioning, neither party takes issue with the court's inquiry into Juror 741's motivations. Additionally, our precedent does not require the court to delve more deeply into the Juror's motivations. Some of our sister Circuits have suggested that inquiring too deeply into a juror's motivations is inappropriate: "[T]he precise reason for a juror's request to be dismissed . . . 'will often be unclear.' The high premium our system puts on the secrecy of jury deliberations precludes a trial court from 'delv[ing] deeply into a juror's motivations.' A court thus may 'prove unable to establish conclusively the reasons underlying' a juror's request to be dismissed." *United States v. McGill*, 815 F.3d 846, 867 (D.C. Cir. 2016) (first

betrays Juror 741's views on discrete legal or evidentiary issues, it merely reveals his personal convictions about following the law. Indeed, Juror 741's articulated reasons for seeking dismissal are even farther removed from the merits of the case than the juror in *Ozomaro*. The *Ozomaro* juror expressed specific bias against one party to the dispute (the government) that directly bore on his assessment of the credibility of the law enforcement witnesses. By contrast, Juror 741 simply stated that he felt he could not follow the law in general, without any clear indication of which party he might favor. We thus conclude that Juror 741 was removed for good cause, not for his view on the merits.

To advance his argument to the contrary, Defendant again argues that we should deduce, from the same two jury notes discussed in section III(A)(1), that "the Jury had made up their minds, tallied [non-unanimous] votes," and that Juror 741 then asked to be removed because he could not withstand the pressure of being the sole holdout juror. Appellant Br. at 17. This, he says, shows that Juror 741 asked to be removed because he wanted to acquit, which constitutes improper removal for his view on the merits. As already discussed, any inference we might draw to that effect would be speculative and falls short of the clear showing of improper motivation for removal required by our caselaw.

This does not end our disposition of Defendant's challenge to the district court's denial of his motion for a new trial. "If a district court properly replaced a juror for good cause, then reversal is warranted" if the defendant makes "a clear showing that" he "was prejudiced by the juror's being excused." *Ozomaro*, 44 F.4th at 546 (cleaned up). Defendant argues that the replacement of a juror during deliberations was inherently prejudicial and thus warrants a new trial.

---

quoting *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987); then quoting *United States v. Symington*, 195 F.3d 1080, 1086 (9th Cir. 1999)).

Based on the record, the district court's removal and replacement of Juror 741 was procedurally sound and did not cause Defendant to suffer any prejudice. As Defendant concedes, "the [district court] took appropriate steps to ensure that the alternate had not been exposed to extrinsic information and that the trial was not [too] overly complex or lengthy" to allow for a replacement. Appellant Br. at 19. The court also individually re-questioned each juror following Juror 741's dismissal, and each stated that he or she could follow the law and begin deliberations anew. The alternate juror also explicitly promised to hold the other jurors to their obligation to follow the court's instruction and begin deliberations from scratch. Under these circumstances, we should assume that there was "little risk of prejudice from the late substitution" because the "judge substituted only after repeatedly and explicitly instructing the jury to start all over again with regards to [its] deliberations." *United States v. Quiroz-Cortez*, 960 F.2d 418, 420 (5th Cir. 1992) (internal quotation marks omitted).

Indeed, the only specific piece of evidence Defendant cites to support his argument that the substitution tainted the jury is that, once the jury was reconstituted, it deliberated for just over an hour before finding Defendant guilty. This, he contends, shows that the original jurors bulldozed the new juror into agreeing with their existing conclusion that Defendant was guilty. Defendant adds that there is always an "inherent coercive effect upon an alternate juror who joins a jury that has . . . already agreed that the accused is guilty." Appellant Br. at 19 (quoting *United States v. Lamb,* 529 F.2d 1153, 1156 (9th Cir. 1975)). Once again, however, the allegation that the eleven original jurors unanimously wanted to convict is entirely speculative, as is the allegation that the new juror experienced coercion from the original jurors. On this record, we cannot conclude that Defendant suffered any prejudice from the juror substitution.

Accordingly, Defendant has failed to show that Juror 741 was removed without good cause or that he suffered any prejudice from the juror substitution. We thus affirm the district court's denial of his motion for a new trial.

### B. Testimony of Task Force Officer Matthew Evans

Defendant next argues that we should grant him a new trial because the district court improperly permitted Task Force Officer Matthew Evans to provide unduly prejudicial testimony against him. Specifically, he argues that the court should not have allowed Officer Evans to (1) testify that drug traffickers often carry guns, (2) testify as to common drug trafficking practices, or to (3) make references to drug cartels in his testimony. Defendant argues that this testimony violated Federal Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." He contends that, because Officer Evans lacked any firsthand knowledge of the incidents giving rise to this case, his testimony was highly prejudicial, but minimally probative.

Before proceeding to the merits of Defendant's argument, we must address one small wrinkle. In this appeal, Defendant premises his argument on the proposition that Officer Evans testified as a lay witness. The government says that he testified as an expert. Although the district court does not appear to have explicitly qualified Officer Evans as an expert prior to his testimony, it would appear that the court—and the parties—ultimately treated and presented him as such. When the government called Officer Evans as a witness, Defendant objected under Federal Rules of Evidence 401 and 403, arguing that he lacked any personal knowledge of the events of this case. The government responded that Officer Evans would "testify[] essentially as an expert witness" based on his extensive experience in drug-crimes law enforcement. Transcript, R. 60, PageID #629. Defendant again objected to Officer Evans serving as any sort of witness and stated that the

government had not disclosed him as an expert. The government retorted that they had disclosed him as a witness to the defense, provided his resume and qualifications, and enumerated the topics he would testify on. The court ruled that Officer Evans Could testify, and ultimately both parties agreed to instruct the jury to treat him as an expert witness.[3] On appeal, Defendant does not challenge Officer Evans' designation or treatment as an expert. We thus conclude that Officer Evans testified as an expert and assess his testimony accordingly.[4]

Proceeding to the merits Defendant's argument, we consider whether Officer Evans' expert testimony was unduly prejudicial under Federal Rule of Evidence 403. "We review a district court's admission of evidence for an abuse of discretion, which occurs if the ruling is based on 'an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *United States v. Dotson*, 715 F.3d 576, 582 (6th Cir. 2013) (quoting *United States v. Semrau,* 693 F.3d 510, 520 (6th Cir. 2012)). Under this standard, we conclude that the district court committed no error in admitting Officer Evans' testimony.

Defendant challenges three discrete aspects of Officer Evans' testimony. First, he argues that it was unduly prejudicial for Officer Evans to testify as to the "commonality of drug trafficking" without having any personal knowledge of the circumstances of this case. Appellant

---

[3] Specifically, the parties agreed to an instruction based on Sixth Circuit Pattern Jury Instruction 7.03, the instruction reserved for expert witnesses in criminal trials. *See United States v. King*, 339 F. App'x 604, 611 (6th Cir. 2009).

[4] We also note that, even if the district court had not treated or designated Officer Evans as an expert witness, we may determine on appeal that he qualified as an expert. *United States v. Anderson,* 89 F.3d 1306, 1312-13 (6th Cir. 1996); *United States v. Rodgers*, 85 F. App'x 483, 487 (6th Cir. 2004). Officer Evans was qualified to testify as an expert witness based on his "knowledge, skill," and "experience." Fed. R. Evid. 702. At the time of his testimony, Officer Evans had worked as a narcotics detective since 2001 and on the FBI's task force focused on high-level drug traffickers for ten years. His professional responsibilities focused on "target[ing] the upper level drug traffickers in Lexington, central Kentucky." Transcript, R. 60, PageID #632. This is sufficient to conclude that he was qualified to testify as an expert witness on matters relating to drug trafficking in Lexington. *See Anderson,* 89 F.3d at 1312 (finding an officer qualified to testify as an expert based on comparable qualifications).

Br. at 21. He takes particular issue with Officer Evans' description of Lexington as a "source city"[5] for drug trafficking and his testimony regarding the quantity of narcotics that constitutes a "distribution amount." Transcript, R. 60, PageID #633-634, 639-640. Defendant's arguments are mistaken. "This Circuit has consistently ruled that an officer may be called as an expert when his or her testimony will be helpful to the jury," *United States v. Smith*, 149 F.3d 1185, *4 (6th Cir. 1998), and expert witnesses need not have firsthand knowledge of the facts of a case in which they offer testimony, *Williams v. Illinois*, 567 U.S. 50, 67 (2012). Because Officer Evans was qualified to offer expert testimony on drug trafficking in Lexington, his testimony was appropriate, relevant, and not unduly prejudicial even though he did not have firsthand knowledge of the facts of this case.

Defendant next argues that it was unduly prejudicial for Officer Evans to testify that drug traffickers frequently use firearms. But our precedent is clear that law enforcement officers serving as expert witnesses may offer testimony "linking the presence of firearms to drug trafficking activities." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (quotation omitted); *see id.* ("[T]he district court did not err in allowing [the law enforcement officer expert witness] to testify that firearms play a role in drug trafficking activity."). It was thus entirely appropriate for Officer Evans to offer his opinion that when "there are multiple people . . . involved with a drug transaction or with trafficking in narcotics, [it is] common for multiple people to be in possession of firearms individually." Transcript, R. 60, PageID #644.

Lastly, Defendant argues that it was unduly prejudicial for Officer Evans to make several references to drug cartels in his testimony. Defendant claims that these brief mentions created the

---

[5] According to Officer Evans, a "source city is usually a major metropolitan area where the cartel sends large loads of drugs, and then it's distributed out from the city to surrounding cities." Transcript, R. 60, PageID #633-634.

impermissible and unsupported inference that he was involved in cartel activity. Our review of the record, however, indicates that Officer Evans never suggested that Defendant was in a cartel; he merely mentioned cartels when providing general explanations about how drug trafficking functions. *See, e.g.*, Transcript, R. 60, PageID #638 (in response to a question on the purpose of mixing different narcotics together, Officer Evans stated that he didn't know if the mixing is "purposeful by the drug cartel or if it's just neglectful"). We see no undue prejudice from these comments, especially considering that none of the counts Defendant was indicted on required proof that he was involved with a drug cartel. Rather, these comments by Officer Evans strike us as the sort of "testimony to explain various practices of drug trafficking" that "law-enforcement officers are frequently allowed to offer." *United States v. Jaffal*, 79 F.4th 582, 603 (6th Cir. 2023).

We thus conclude that the district court did not abuse its discretion in admitting testimony from Officer Evans.

### C. Sufficiency of the Evidence

Defendant argues that the evidence offered by the government was insufficient to prove that he was guilty of Counts 1 and 2, the 21 U.S.C. § 84l(a)(l) charges for possession of a narcotic with intent to distribute. To convict a defendant under § 84l(a)(l), the government must prove that he "(1) knowingly or intentionally (2) possessed a controlled substance (3) with intent to distribute." *United States v. Hampton*, 769 F. App'x 308, 310 (6th Cir. 2019) (citing *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006)). Advancing what is essentially a chain of custody argument, Defendant argues that the government presented insufficient evidence to prove the second element, possession. He contends that due to the police's mishandling of the narcotics evidence, it is impossible for the government to prove that the substances recovered from Defendant at his arrest are the same substances that the Kentucky State Police lab ultimately tested

and determined to be illegal narcotics. Accordingly, he asks us to determine that there is no evidence that he ever possessed illegal drugs and thus overturn his convictions under Counts 1 and 2.

We review a sufficiency of the evidence challenge *de novo* to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (emphasis removed) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, we conclude that there was sufficient evidence for the jury to conclude that Defendant possessed illegal narcotics in violation of § 84l(a)(l) and affirm his conviction.

Defendant contends that the government failed to prove the possession because of the following chain of custody problems with the narcotics evidence: (1) the forensic lab report with the results of the drug testing names the suspect not as Tevye Jones, but as Quentin Leavell; (2) the date of the offense on Deputy Wakefield's request for drug testing is inaccurately listed as December 1, 2023 instead of November 30, 2023; (3) police labels on the individual drug baggies indicated they were entered into evidence on December 6, several days after police claimed they had been sent for testing; (4) the police's digital evidence management system shows that officers other than Deputy Wakefield booked the drugs evidence into custody; (5) there was a discrepancy between the number of baggies seized from Defendant and the number that were ultimately tested for drugs; and (6) there was a discrepancy between the weight of the drugs as recorded by the testing lab and as recorded by Deputy Wakefield in his initial police report. All of these problems together, he argues, are fatal to the government's case with respect to possession.

Although some of these facts might appear troubling at first glance, our review of the record indicates that the government presented thorough and reasonable explanations for all of these discrepancies. As to the issue of Quentin Leavell's name appearing on the lab report, Deputy Wakefield, who was in charge of the investigation into Defendant's crimes, testified that he used Leavell's name in his request for forensic testing because, at the time Deputy Wakefield submitted the request, Defendant had refused to reveal his name and identity. Accordingly, Deputy Wakefield used Leavell's name, under which the car Defendant had been driving when arrested was registered. Deputy Wakefield also explained that he used the credentials of other officers to log into the police's evidence-management system because, having only been hired into his role one month prior to Defendant's arrest, he did not yet have his own login credential. He confirmed in trial testimony that he was the officer who actually logged all of the evidence into the system.

Deputy Wakefield's testimony at trial also provided reasonable explanations for the date discrepancies that Defendant contends are fatal to the narcotics' chain of custody. He testified that the drugs seized from the scene on November 30, 2023 were logged into evidence after midnight—hence the December 1, 2023 offense date on the request for drug testing. As to why the drug baggies were marked as processed on December 6, Deputy Wakefield conceded that he initially incorrectly booked all of the baggies of drugs together as one piece of evidence, an error he attributes to his inexperience. His supervisor later informed Deputy Wakefield that he needed to reprocess and reenter each baggy as its own piece of evidence, which he did on December 6.

The government also presented sufficient evidence to reasonably explain the discrepancies in both the weight of the narcotics and the number of baggies ultimately tested by the forensics lab. With respect to the discrepancies between the weight of the drugs that appeared in Officer Wakefield's police report and the weight reported by the forensics lab, Deputy Wakefield explained

he simply "could have made a mistake" when weighing all of the baggies at the scene of the crime due to high emotions or "rushing" adrenaline. Transcript, R. 59, PageID #545-46. As to the discrepancies between the number of baggies seized (ten), and the number of baggies tested (three), Meghan Peders, the laboratory scientist who tested the drugs, testified that, as a general practice, the Kentucky State Police lab "typically . . . test[s] approximately three items" when multiple narcotics items are sent. *Id.* at PageID #575. She specifically stated that this practice was why the lab tested only three of the drug baggies collected from Defendant.

All of this evidence submitted by the government is enough to demonstrate a clear connection between the substances collected from Defendant upon arrest and those that were ultimately determined to be illegal narcotics by the testing lab. We acknowledge that Defendant has pointed to certain weaknesses or flaws in the police's processing of the evidence. Perhaps most notably, Deputy Wakefield's inexperience-driven errors, including the incorrect logging of the drug baggies and the inaccurate drug weights he recorded at the scene of Defendant's arrest. However, it is not our place to "weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury" in our sufficiency review. *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). "It was the jury's prerogative to believe what [the government's witnesses] had to say" and ultimately convict Defendant. *United States v. Cordero*, 973 F.3d 603, 614 (6th Cir. 2020).

We thus conclude that there was sufficient evidence for a rational juror to determine that Defendant possessed illegal narcotics as specified in the indictment in violation of § 84l(a)(l) and affirm his convictions under Counts 1 and 2.

## IV.    CONCLUSION

For the reasons set forth above, we **AFFIRM** Defendant's convictions.